**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1937

SUHAIL NAJIM ABDULLAH AL SHIMARI; TAHA YASEEN ARRAQ RASHID;
SALAH HASAN NUSAIF AL-EJAILI; ASA'AD HAMZA HANFOOSH AL-
ZUBA'E,

    Plaintiffs - Appellants,

   v.

CACI PREMIER TECHNOLOGY, INC.; CACI INTERNATIONAL, INC.,

    Defendants – Appellees,

   and

TIMOTHY DUGAN; L-3 SERVICES, INC.,

    Defendants.

--------------------------------

CIVIL PROCEDURE PROFESSORS; DOLLY FILARTIGA; ABUKAR HASSAN
AHMED; DANIEL ALVARADO; DR. JUAN ROMAGOZA ARCE; ALDO
CABELLO; ZITA CABELLO; AZIZ MOHAMED DERIA; NERIS GONZALES;
CARLOS MAURICIO; GLORIA REYES; OSCAR REYES; CECILIA SANTOS
MORAN; ZENAIDA VELASQUEZ; BASHE ABDI YOUSUF; INTERNATIONAL
LAW SCHOLARS; WILLIAM R. CASTO; MARTIN S. FLAHERTY; NASSER
HUSSEIN; STANLEY N. KATZ; MICHAEL LOBBAN; JENNY S. MARTINEZ;
RETIRED MILITARY OFFICERS; UNITED NATIONS SPECIAL
RAPPORTEURS ON TORTURE,

    Amici Supporting Appellants.

**No. 13-2162**

SUHAIL NAJIM ABDULLAH AL SHIMARI; TAHA YASEEN ARRAQ RASHID; SALAH HASAN NUSAIF AL-EJAILI; ASA'AD HAMZA HANFOOSH AL-ZUBA'E,

Plaintiffs – Appellants,

v.

CACI PREMIER TECHNOLOGY, INC.; CACI INTERNATIONAL, INC.,

Defendants – Appellees,

and

TIMOTHY DUGAN; L-3 SERVICES, INC.,

Defendants.

--------------------------------

CIVIL PROCEDURE PROFESSORS; DOLLY FILARTIGA; ABUKAR HASSAN AHMED; DANIEL ALVARADO; DR. JUAN ROMAGOZA ARCE; ALDO CABELLO; ZITA CABELLO; AZIZ MOHAMED DERIA; NERIS GONZALES; CARLOS MAURICIO; GLORIA REYES; OSCAR REYES; CECILIA SANTOS MORAN; ZENAIDA VELASQUEZ; BASHE ABDI YOUSEF; INTERNATIONAL LAW SCHOLARS; WILLIAM R. CASTRO; MARTIN S. FLAHERTY; NASSER HUSSEIN; STANLEY N. KATZ; MICHAEL LOBBAN; JENNY S. MARTINEZ; RETIRED MILITARY OFFICERS; UNITED NATIONS SPECIAL RAPPORTEURS ON TORTURE,

Amici Supporting Appellants.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:08-cv-00827-GBL-JFA)

Argued:  March 18, 2014                    Decided:  June 30, 2014

Before KEENAN and FLOYD, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

———————————

Vacated and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Floyd and Judge Cogburn joined.

———————————

**ARGUED**: Baher Azmy, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; Robert P. LoBue, PATTERSON, BELKNAP, WEBB & TYLER, New York, New York, for Appellants. Joseph William Koegel, Jr., STEPTOE & JOHNSON LLP, Washington, D.C., for Appellees. **ON BRIEF**: Katherine Gallagher, Jeena Shah, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; Shereef Hadi Akeel, AKEEL & VALENTINE, P.C., Troy, Michigan; George Brent Mickum IV, LAW FIRM OF GEORGE BRENT MICKUM IV, Bethesda, Maryland, for Appellants. John F. O'Connor, STEPTOE & JOHNSON LLP, Washington, D.C., for Appellees. Tyler R. Giannini, Sarah P. Alexander, International Human Rights Clinic, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Amici William R. Casto, Martin S. Flaherty, Nasser Hussain, Stanley N. Katz, Michael Lobban, and Jenny S. Martinez. Stephen B. Pershing, THE CHAVERS FIRM, LLC, Washington, D.C.; Ralph G. Steinhardt, Arin Melissa Brenner, GEORGE WASHINGTON UNIVERSITY LAW SCHOOL, Washington, D.C., for Amicus International Law Scholars. Jonathan Hafetz, Rachel Godsil, Jon Romberg, Chelsea Jasnoff, Matthew Mierswa, Center for Social Justice, SETON HALL UNIVERSITY SCHOOL OF LAW, Newark, New Jersey, for Amicus Retired Military Officers. L. Kathleen Roberts, Nushin Sarkarati, Scott A. Gilmore, THE CENTER FOR JUSTICE & ACCOUNTABILITY, San Francisco, California; Ali A. Beydoun, UNROW HUMAN RIGHTS IMPACT LITIGATION CLINIC, Washington, D.C., for Amici Dolly Filartiga, Abukar Hassan Ahmed, Daniel Alvarado, Juan Romagoza Arce, Aldo Cabello, Zita Cabello, Aziz Mohamed Deria, Neris Gonzales, Carlos Mauricio, Gloria Reyes, Oscar Reyes, Cecilia Santos Moran, Zenaida Velasquez, and Bashe Abdi. Deena R. Hurwitz, Lauren Schnyer, Second Year Law Student, Jennifer Tian, Third Year Law Student, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Amicus United Nations Special Rapporteurs on Torture. Joshua S. Devore, Agnieszka M. Fryszman, CHOEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Amici Civil Procedure Professors, Erwin Chemerinsky, Helen Hershkoff, Allan Paul Ides, Stephen I. Vladeck, and Howard M. Wasserman.

———————————

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we consider whether a federal district court has subject matter jurisdiction to consider certain civil claims seeking damages against an American corporation for the torture and mistreatment of foreign nationals at the Abu Ghraib prison in Iraq.[1] The primary issue on appeal concerns whether the Alien Tort Statute, 28 U.S.C. § 1350, as interpreted by the Supreme Court in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013), provides a jurisdictional basis for the plaintiffs' alleged violations of international law, despite the presumption against extraterritorial application of acts of Congress. We also address the defendants' contention that the case presents a "political question" that is inappropriate for judicial resolution under our decision in Taylor v. Kellogg Brown & Root Services, Inc., 658 F.3d 402 (4th Cir. 2011).

We conclude that the Supreme Court's decision in Kiobel does not foreclose the plaintiffs' claims under the Alien Tort Statute, and that the district court erred in reaching a contrary conclusion. Upon applying the fact-based inquiry articulated by the Supreme Court in Kiobel, we hold that the

---

[1] Some of the information pertinent to this appeal has been filed under seal. This Court has avoided reference to sealed documents to the greatest extent possible and has made any necessary redactions to the publicly available version of the opinion.

plaintiffs' claims "touch and concern" the territory of the United States with sufficient force to displace the presumption against extraterritorial application of the Alien Tort Statute. See Kiobel, 133 S. Ct. at 1669. However, we are unable to determine from the present record whether the claims before us present nonjusticiable political questions. Therefore, we do not reach the additional issue of the district court's dismissal of the plaintiffs' common law claims, and we vacate the district court's judgment with respect to all the plaintiffs' claims and remand the case to the district court. We direct that the district court undertake factual development of the record and analyze its subject matter jurisdiction in light of our decision in Taylor and the principles expressed in this opinion.

I.

In 2003, a multi-national force led by the United States and the United Kingdom invaded Iraq and deposed its sovereign leader, Saddam Hussein. The United States took control of Abu Ghraib, the site of a prison facility near Baghdad, and used the prison to detain various individuals, including criminals, enemies of the provisional government, and other persons selected for interrogation because they were thought to possess information regarding Iraqi insurgents.

5

Due to a shortage of trained military interrogators, the United States hired civilian contractors to interrogate detainees at Abu Ghraib. During the time period relevant to this civil action, those private interrogators were provided exclusively by CACI Premier Technology, Inc. (CACI), a corporation domiciled in the United States. CACI's corporate headquarters is located in Virginia, and CACI is a wholly-owned subsidiary of CACI International, Inc. (CACI International), a publicly traded Delaware corporation that also has corporate headquarters in Virginia.

According to an official investigation commissioned by the United States Department of Defense (Defense Department), "numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees" at the Abu Ghraib prison between October and December 2003. MAJ. GEN. ANTONIO M. TAGUBA, ARTICLE 15-6 INVESTIGATION OF THE 800TH MILITARY POLICE BRIGADE 16 (2004) [hereinafter REPORT OF MAJ. GEN. TAGUBA]. These atrocities were condemned by the President of the United States as being "abhorrent" practices that "don't represent America." White House, Press Release, President Bush Meets with Al Arabiya Television, 2004 WLNR 2540883 (May 5, 2004). Both houses of Congress condemned the abuses, stating that those acts "contradict[ed] the policies, orders, and laws of the United States and the United States military," H.R. Res. 627, 108th

Cong. (2004), and "urg[ing] that all individuals responsible for such despicable acts be held accountable," S. Res. 356, 108th Cong. (2004). Investigations conducted by the Defense Department concluded that CACI interrogators directed or participated in some of the abuses, along with a number of military personnel. <u>See</u> REPORT OF MAJ. GEN. TAGUBA 48; MAJ. GEN. GEORGE R. FAY, ARTICLE 15-6 INVESTIGATION OF THE ABU GHRAIB DETENTION FACILITY AND 205TH MILITARY INTELLIGENCE BRIGADE 7-8, 84, 86-87, 89, 116-17, 132-35 (2004).

The four plaintiffs in this case are foreign nationals who allege that they were tortured and otherwise mistreated by American civilian and military personnel while detained at Abu Ghraib.[2] Among many other examples of mistreatment, the plaintiffs describe having been "repeatedly beaten," "shot in the leg," "repeatedly shot in the head with a taser gun," "subjected to mock execution," "threatened with unleashed dogs," "stripped naked," "kept in a cage," "beaten on [the] genitals with a stick," "forcibly subjected to sexual acts," and "forced to watch" the "rape[] [of] a female detainee." Many of the acts allegedly were perpetrated "during the night shift" in order to

---

[2] The record does not contain any evidence that the plaintiffs were designated "enemy combatants" by the United States government. In fact, Defense Department documents in the record state that plaintiff Al Shimari "is <u>not</u> an Enemy Combatant in the Global War on Terror." (Emphasis in original.)

"minimize the risk of detection by nonparticipants" and to "soften up" the detainees for later interrogation.

The plaintiffs allege that CACI employees "instigated, directed, participated in, encouraged, and aided and abetted conduct towards detainees that clearly violated the Geneva Conventions, the Army Field Manual, and the laws of the United States." In particular, the plaintiffs allege that in the "command vacuum at Abu Ghraib," CACI interrogators operated with "little to no supervision" and were perceived as superiors by United States military personnel. Military personnel allegedly carried out orders issued by the CACI civilian interrogators to "soften up" and "set conditions" for the abuse of particular detainees, contrary to the terms of CACI's contract with the United States government.

In that contract, which was executed in August 2003, CACI agreed to provide interrogation-related services to the military. This contract was not awarded by the Defense Department or military sources, but by the Department of the Interior (Interior Department). The contract, which was issued by an Interior Department contracting officer in Arizona, authorized CACI to collect payments in excess of $19 million by mailing invoices to Interior Department accounting offices in Colorado.

Under the terms of the Statement of Work (SOW) governing CACI's contract with the government, CACI was obligated to supply interrogation "management and support" and to "function[] as resident experts" in interrogation regulations and procedures. The SOW stated that CACI would "provide Interrogation Support Cells, as directed by military authority, . . . to assist, supervise, coordinate, and monitor all aspects of interrogation activities." The SOW further specified that "[t]he Contractor is responsible for providing supervision for all contractor personnel."

The plaintiffs allege that during CACI's performance of this contract, CACI's managers failed to hire suitable interrogators, insufficiently supervised CACI employees, ignored reports of abuse, and attempted to "cover up" the misconduct. The plaintiffs further allege that CACI's site manager at the Abu Ghraib prison, Daniel Porvaznik, reviewed interrogation reports that "raised concerns of potential abuse" by CACI employees, established "daily contact with CACI [] in the United States," and submitted reports that were reviewed weekly by CACI's executive team in the United States "to assess the company's overall worldwide business situation." The plaintiffs also claim that CACI vice-president Chuck Mudd traveled "regularly" to Iraq to become familiar with the interrogation operation at Abu Ghraib.

9

In addition, the plaintiffs allege that, despite troubling reports from CACI employees, CACI management failed to investigate or to report accusations of wrongdoing and repeatedly denied that any CACI employees had engaged in abusive conduct. Also, according to the complaint, CACI management

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

The present litigation began with a civil action filed in June 2008 by plaintiff Suhail Najim Abdullah Al Shimari (Al Shimari) against CACI, CACI International, former CACI employee Timothy Dugan, and L-3 Services, Inc., another government contractor. The action originally was filed in the Southern District of Ohio, where defendant Timothy Dugan resided. In the complaint, Al Shimari alleged claims under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, including claims of war crimes, torture, and cruel, inhuman, or degrading treatment (collectively, the ATS claims). The complaint also contained numerous common law claims, including claims of assault and battery, sexual assault and battery, intentional and negligent infliction of emotional distress, and negligent hiring and training (collectively, the common law tort claims).

In August 2008, Al Shimari's action was transferred to the Eastern District of Virginia, where the corporate headquarters

10

of CACI and CACI International are located. The following month, Al Shimari submitted an amended complaint that included the similar claims of three other plaintiffs, namely, Taha Yaseen Arraq Rashid, Salah Hasan Nusaif Al-Ejaili, and Asa'ad Hamza Hanfoosh Al-Zuba'e[3] (collectively, the Rashid plaintiffs). The amended complaint also identified the names of three CACI employees who allegedly "directed and caused some of the most egregious [acts of] torture and abuse at Abu Ghraib," which information was based on post-conviction testimony and statements given by military personnel who had been prosecuted for their misconduct.

In October 2008, the defendants moved to dismiss the amended complaint on numerous grounds, including the political question doctrine, federal preemption, derivative sovereign immunity, and lack of subject matter jurisdiction under the ATS. The district court denied the defendants' motion and held that the plaintiffs' allegations did not present a political question. However, the court concluded that it lacked jurisdiction over the plaintiffs' ATS claims because of the novelty of asserting such claims against private parties as

---

[3] We note that various spellings of the name of one of the plaintiffs, Asa'ad Hamza Hanfoosh Al-Zuba'e, appear in documents filed with the district court and in the parties' appellate briefs. For the purposes of this opinion, we adopt the spelling that appears on the face of the plaintiffs' third amended complaint and in the plaintiffs' opening brief.

opposed to state actors, and indicated that those claims could only proceed under diversity or federal question jurisdiction rather than under the ATS. CACI filed an interlocutory appeal of the district court's decision.

On appeal, a panel of this Court concluded that the district court erred in permitting the plaintiffs' claims to proceed because they were preempted by federal law under the Supreme Court's reasoning in Boyle v. United Technologies Corp., 487 U.S. 500 (1988). Al Shimari v. CACI Int'l, Inc., 658 F.3d 413 (4th Cir. 2011), vacated, 679 F.3d 205 (4th Cir. 2012) (en banc). However, after granting the plaintiffs' petition for rehearing en banc, this Court vacated the panel's decision and dismissed the defendants' interlocutory appeal. See Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (en banc).

Our en banc decision was based on the conclusion that we lacked appellate jurisdiction because the district court's rulings were not appealable under the collateral order doctrine articulated by the Supreme Court in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949). See Al Shimari, 679 F.3d at 212-13. We observed that a denial of a motion to dismiss on political question grounds does not itself constitute an immediately appealable collateral order. Id. at 215. We also explained that we were unable to exercise "pendent" appellate jurisdiction because there was no independent

12

jurisdictional basis for the appeal. See id. at 210, 224 (rejecting existence of an independent basis for jurisdiction by virtue of the defendants asserting the "law-of-war defense" under Coleman v. Tennessee, 97 U.S. 509 (1878), and Dow v. Johnson, 100 U.S. 158 (1879); preemption by the "combatant activities" exception to the Federal Tort Claims Act, as recognized by Saleh v. Titan Corp., 580 F.3d 1 (D.C. Cir. 2009); or absolute official immunity under Mangold v. Analytic Services, Inc., 77 F.3d 1442 (4th Cir. 1996)).

The case was returned to the district court, which entered a number of orders that are relevant to this appeal. First, the district court reinstated the plaintiffs' ATS claims, observing that "a growing body of law . . . suggests that plaintiffs' claims . . . are within the purview of international law." The court dismissed some of the plaintiffs' claims as insufficiently pleaded, but permitted the plaintiffs to amend their pleadings to allege a conspiracy between CACI and the United States military. The court also dismissed the Rashid plaintiffs' common law tort claims with prejudice, concluding that Virginia law applied to the common law claims and that those claims were barred by the applicable statute of limitations and by a recent decision of the Supreme Court of Virginia holding that equitable tolling was unavailable under Virginia law.

13

The plaintiffs filed a third amended complaint against CACI only, which contained all four plaintiffs' ATS claims and only plaintiff Al Shimari's common law tort claims. The deadline for discovery in the case expired in April 2013. However, the record reflects that only a limited amount of information was obtained during discovery. Three of the four plaintiffs did not give deposition testimony in the case. Also, no depositions appear to have been taken of any individuals who served as former interrogators at Abu Ghraib, including the CACI interrogators who were identified specifically by the plaintiffs as participants in the alleged abuse.

Within weeks of the close of discovery, the Supreme Court issued its decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013). In the majority opinion in that case, the Court discussed limitations on the scope of ATS jurisdiction imposed by a canon of statutory interpretation known as the presumption against extraterritorial application. Id. Based on the decision in Kiobel, the district court dismissed all four plaintiffs' ATS claims, concluding that the court "lack[ed] ATS jurisdiction over Plaintiffs' claims because the acts giving rise to their tort claims occurred exclusively in Iraq, a foreign sovereign."

The district court also dismissed Al Shimari's remaining common law tort claims, holding that governing Iraqi law

14

promulgated by the Coalition Provisional Authority (CPA)[4] precluded imposition of liability on the defendants, and awarded CACI $13,731.61 in costs as the prevailing party in the civil action. The plaintiffs timely appealed the district court's entry of final judgment with respect to all four plaintiffs' ATS and common law claims, as well as the district court's taxation of costs against the plaintiffs.

## II.

We address CACI's two challenges to our subject matter jurisdiction. Because the district court dismissed the plaintiffs' claims under the ATS for lack of jurisdiction, we first consider the jurisdictional scope of the ATS and whether the plaintiffs' ATS claims fall within the reach of the statute. Based on our conclusion that the plaintiffs' ATS claims are within the statute's reach, we also address whether those claims or the plaintiffs' common law tort claims raise any nonjusticiable political questions.

---

[4] The CPA was a temporary governing body that was created by U.S. Army General Tommy Franks, the Commander of Coalition Forces, and recognized by a United Nations Security Council resolution. See, e.g., U.S. ex rel. DRC, Inc. v. Custer Battles, LLC, 562 F.3d 295, 297 (4th Cir. 2009). The CPA governed Iraq from May 2003 to June 2004, when governing authority passed to the Interim Government of Iraq. Id. at 298.

A.

The plaintiffs seek to impose liability on CACI for alleged violations of international law, including torture. They assert that the claimed violations fall within the jurisdictional scope of the ATS, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS, which was created as part of the Judiciary Act of 1789, enables federal courts to consider a limited category of claims that are defined by the law of nations. Sosa v. Alvarez-Machain, 542 U.S. 692, 712, 724-25 (2004).

The international law violations that may be asserted under the ATS must be sufficiently definite in their content and acceptance among civilized nations that they reflect "historical paradigms" that were familiar at the time that the ATS was enacted. Id. at 732. Paradigmatic violations of the law of nations that were "probably on [the] minds" of the drafters of the ATS include "violation of safe conducts, infringement of the rights of ambassadors, and piracy." Id. at 715; see also id. at 720. The Supreme Court also has suggested that the prohibition against torture exemplifies a norm that is "specific, universal, and obligatory." Kiobel, 133 S. Ct. at 1665 (citation omitted); see also Filartiga v. Pena-Irala, 630 F.2d 876, 884-87 (2d Cir.

16

1980) (holding that "official torture is now prohibited by the law of nations" and that federal courts may exercise jurisdiction under the ATS concerning such international violations).  Indeed, in the present case, the district court held that the plaintiffs' ATS claims for torture, war crimes, and cruel, inhuman, or degrading treatment alleged sufficiently definite and universal violations of international law.

We emphasize, however, that we do not have before us the question whether the plaintiffs sufficiently have stated or established claims under the ATS alleging violations of international law.[5]  Instead, we address our subject matter jurisdiction under the ATS, and decide whether the district court erred in holding that the ATS does not provide a cause of action for tortious conduct occurring outside the United States.

We begin by observing that the ATS is a jurisdictional statute that addresses "the power of the courts to entertain cases concerned with a certain subject," and does not authorize the courts to "mold substantive law."  Sosa, 542 U.S. at 713-14; see also id. at 712 (stating that "the statute is in terms only jurisdictional"); id. at 717 (comparing the ATS to other grants of original jurisdiction in the Constitution and the Judiciary

---

[5] We also do not have before us the question whether a corporation can be held liable for the tortious conduct of its employees constituting international law violations under the ATS.

17

Act of 1789); id. at 724 (stating that the ATS "is a jurisdictional statute creating no new causes of action"). Thus, the ATS confers jurisdiction on the district courts to consider certain types of tort claims asserted by aliens based on alleged violations of the law of nations, but does not create any particular causes of action. See Kiobel, 133 S. Ct. at 1663; Sosa, 542 U.S. at 712.

In Kiobel, the Supreme Court considered "whether a claim [brought under the ATS] may reach conduct occurring in the territory of a foreign sovereign." 133 S. Ct. at 1664. In that case, Nigerian nationals (the petitioners), who became legal residents of the United States after being granted political asylum, brought tort claims under the ATS against certain British, Dutch, and Nigerian corporations. Id. at 1662-63. In their complaint, the petitioners contended that the corporate defendants violated the law of nations by aiding and abetting atrocities committed by Nigerian military and police forces,[6] in providing those forces with food, transportation, compensation, and access to property. Id. at 1662-63.

All the atrocities were alleged to have been committed in Nigeria, and it was undisputed that none of the conduct alleged

_____

[6] The petitioners alleged that Nigerian police and military forces were responsible for "beating, raping, killing, and arresting residents and destroying or looting property." Kiobel, 133 S. Ct. at 1662.

18

in the complaint occurred within the territory of the United States.  Id. at 1662-63.  Moreover, none of the defendants had engaged in any activities in the United States that appeared relevant to the claimed tortious acts that occurred in Nigeria.  The ATS claims' only connections to the territory of the United States consisted of the foreign corporate defendants' listings on the New York Stock Exchange and their affiliation with a public relations office in New York City.  Id. at 1677 (Breyer, J., concurring in the judgment).

The Supreme Court held that the petitioners' ATS claims were barred.  Id. at 1669 (majority opinion).  In reaching this conclusion, the Court primarily relied on the principles underlying an established canon of statutory interpretation, which raises a presumption against extraterritorial application of acts of Congress ("the presumption," or "the presumption against extraterritorial application").  See id. at 1664-65, 1669.  The presumption reflects the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States" because "Congress ordinarily legislates with respect to domestic, not foreign matters." Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 255 (2010) (citations and internal quotation marks omitted).

The Supreme Court explained that the principles underlying the presumption restrain courts in their consideration of causes of action that may be brought under the ATS. Kiobel, 133 S. Ct. at 1664. Those principles reflect "foreign policy concerns" arising from potential "unintended clashes between our laws and those of other nations which could result in international discord," and from "the danger of unwarranted judicial interference in the conduct of foreign policy." Id. (citation omitted).

Under the presumption, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none[.]" Id. (quoting Morrison, 561 U.S. at 255). After considering the text of the ATS, the Court held in Kiobel that nothing in the statutory language provided a clear indication that the statute was intended to have extraterritorial reach. Id. at 1669. The Court concluded that although "Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad," Congress failed to do so when it enacted the ATS. Id. at 1665. Thereafter, the Supreme Court held that the "petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred." Id. at 1669.

Crucially, however, the Court explained its holding by stating that "[o]n these facts, all the relevant conduct took

20

place outside the United States." Id. The Court elaborated that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." Id. And, in a reference to the fact that the petitioners had not alleged any connection with the territory of the United States other than the physical presence of the foreign corporate defendants, the Court explained that "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices." Id.

We observe that the Supreme Court used the phrase "relevant conduct" to frame its "touch and concern" inquiry, but never defined that term. Under the facts presented, there was no need to do so because all the conduct underlying the petitioners' claims occurred outside United States territory. We also note that the Court broadly stated that the "claims," rather than the alleged tortious conduct, must touch and concern United States territory with sufficient force, suggesting that courts must consider all the facts that give rise to ATS claims, including the parties' identities and their relationship to the causes of action. Id.; see, e.g., Black's Law Dictionary 281 (9th ed. 2009) (defining "claim" as the "aggregate of operative facts giving rise to a right enforceable by a court").

21

The Court's choice of such broad terminology was not happenstance, as illustrated by the opinions of concurring Justices who offered alternative views. For example, Justice Alito, in a concurring opinion in which Justice Thomas joined, advocated a "broader" view of the presumption's effect on ATS jurisdiction, which would bar an ATS action "unless the domestic conduct is sufficient to violate an international law norm" that is sufficiently definite and accepted among civilized nations. Kiobel, 133 S. Ct. at 1670 (Alito, J., concurring). Under the standard proposed by Justice Alito, courts could consider only the domestic tortious conduct of the defendants. Such an analysis is far more circumscribed than the majority opinion's requirement that "the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Id. at 1669 (majority opinion).

The "touch and concern" language set forth in the majority opinion contemplates that courts will apply a fact-based analysis to determine whether particular ATS claims displace the presumption against extraterritorial application. In an opinion concurring in the judgment, Justice Breyer, with whom Justice Ginsburg, Justice Sotomayor, and Justice Kagan joined, would have allowed jurisdiction whenever: "(1) the alleged tort occurs on American soil, (2) the defendant is an American national, or

22

(3) the defendant's conduct substantially and adversely affects an important American national interest." Id. at 1674 (Breyer, J., concurring in the judgment).  And, as Justice Kennedy observed in his concurring opinion, the Supreme Court evidently left unanswered "significant questions regarding the reach and interpretation of the Alien Tort Statute" that "may require some further elaboration and explanation" of the "proper implementation" of the presumption in cases that are not "covered . . . by the reasoning and holding of [Kiobel]." Id. at 1669 (Kennedy, J., concurring).

In the present case, the plaintiffs argue that based on Kiobel, the ATS provides jurisdiction for claims that "touch and concern" United States territory with "sufficient force to displace" the presumption. See id. (majority opinion). The plaintiffs contend that their claims' substantial connections to United States territory are sufficient to rebut the presumption.

In response, the defendants argue that, under the decision in Kiobel, the ATS does not under any circumstances reach tortious conduct occurring abroad. The defendants maintain that the sole material consideration before us is the fact that the plaintiffs' claims allege extraterritorial tortious conduct, which subjects their claims to the same fatal outcome as those in Kiobel. We disagree with the defendants' argument, which

23

essentially advances the view expressed by Justices Alito and Thomas in their separate opinion in Kiobel.

Because five justices, including Justice Kennedy, joined in the majority's rationale applying the presumption against extraterritorial application, the presumption is part of the calculus that we apply here. However, the clear implication of the Court's "touch and concern" language is that courts should not assume that the presumption categorically bars cases that manifest a close connection to United States territory. Under the "touch and concern" language, a fact-based analysis is required in such cases to determine whether courts may exercise jurisdiction over certain ATS claims. Accordingly, the presumption against extraterritorial application bars the exercise of subject matter jurisdiction over the plaintiffs' ATS claims unless the "relevant conduct" alleged in the claims "touch[es] and concern[s] the territory of the United States with sufficient force to displace the presumption . . . ." 133 S. Ct. at 1669.

In Kiobel, the Court's observation that all the "relevant conduct" occurred abroad reflected those claims' extremely attenuated connection to United States territory, which amounted to "mere corporate presence." Indeed, the only facts relating to the territory of the United States were the foreign corporations' public relations office in New York City and their

24

listings on the New York Stock Exchange. Because the petitioners in Kiobel were unable to point to any "relevant conduct" in their claims that occurred in the territory of the United States, the presumption was conclusive when applied to the facts presented.

In the present case, however, the issue is not as easily resolved. The plaintiffs' claims reflect extensive "relevant conduct" in United States territory, in contrast to the "mere presence" of foreign corporations that was deemed insufficient in Kiobel. When a claim's substantial ties to United States territory include the performance of a contract executed by a United States corporation with the United States government, a more nuanced analysis is required to determine whether the presumption has been displaced. In such cases, it is not sufficient merely to say that because the actual injuries were inflicted abroad, the claims do not touch and concern United States territory.

Here, the plaintiffs' claims allege acts of torture committed by United States citizens who were employed by an American corporation, CACI, which has corporate headquarters located in Fairfax County, Virginia. The alleged torture occurred at a military facility operated by United States government personnel.

In addition, the employees who allegedly participated in the acts of torture were hired by CACI in the United States to fulfill the terms of a contract that CACI executed with the United States Department of the Interior. The contract between CACI and the Department of the Interior was issued by a government office in Arizona, and CACI was authorized to collect payments by mailing invoices to government accounting offices in Colorado. Under the terms of the contract, CACI interrogators were required to obtain security clearances from the United States Department of Defense.

Finally, the allegations are not confined to the assertion that CACI's employees participated directly in acts of torture committed at the Abu Ghraib prison. The plaintiffs also allege that CACI's managers located in the United States were aware of reports of misconduct abroad, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it.

These ties to the territory of the United States are far greater than those considered recently by the Second Circuit in Balintulo v. Daimler AG, 727 F.3d 174 (2d Cir. 2013). In that case, the Second Circuit declined to extend ATS jurisdiction to claims involving foreign conduct by South African subsidiaries of American corporations. See id. at 189-94. The plaintiffs in Balintulo alleged that those corporations "s[old] cars and computers to the South African government, thus facilitating the

26

apartheid regime's innumerable race-based depredations and injustices, including rape, torture, and extrajudicial killings." Id. at 179-80. Interpreting the holding of Kiobel to stand for the proposition that "claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States," id. at 189 (citing Kiobel, 133 S. Ct. at 1662, 1668-69), the Second Circuit construed the Court's "touch and concern" language as impacting the exercise of jurisdiction only "when some of the relevant conduct occurs in the United States." Id. at 191 (footnote omitted) (emphasis in original); see also Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 45-46, 49-50 (2d Cir. 2014) (applying Kiobel to foreclose jurisdiction over ATS claims filed by a Bangladeshi plaintiff who allegedly was detained and tortured by the Bangladesh National Police at the direction of his Bangladeshi business partner).

Although the "touch and concern" language in Kiobel may be explained in greater detail in future Supreme Court decisions, we conclude that this language provides current guidance to federal courts when ATS claims involve substantial ties to United States territory. We have such a case before us now, and we cannot decline to consider the Supreme Court's guidance simply because it does not state a precise formula for our analysis.

27

Applying this guidance, we conclude that the ATS claims' connection to the territory of the United States and CACI's relevant conduct in the United States require a different result than that reached in Kiobel. In its decision in Morrison, the Supreme Court emphasized that although the presumption is no "timid sentinel," its proper application "often[] is not self-evidently dispositive" and "requires further analysis." 561 U.S. at 266. We have undertaken that analysis here, employing the "touch and concern" inquiry articulated in Kiobel, by considering a broader range of facts than the location where the plaintiffs actually sustained their injuries.

Indeed, we observe that mechanically applying the presumption to bar these ATS claims would not advance the purposes of the presumption. A basic premise of the presumption against extraterritorial application is that United States courts must be wary of "international discord" resulting from "unintended clashes between our laws and those of other nations." Kiobel, 133 S. Ct. at 1664 (citation omitted). In the present case, however, the plaintiffs seek to enforce the customary law of nations through a jurisdictional vehicle provided under United States law, the ATS, rather than a federal statute that itself details conduct to be regulated or enforced. Thus, any substantive norm enforced through an ATS claim necessarily is recognized by other nations as being actionable.

28

Moreover, this case does not present any potential problems associated with bringing foreign nationals into United States courts to answer for conduct committed abroad, given that the defendants are United States citizens. Cf. Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 322-24 (D. Mass. 2013) (holding that Kiobel did not bar ATS claims against an American citizen, in part because "[t]his is not a case where a foreign national is being hailed into an unfamiliar court to defend himself").

We likewise note that further litigation of these ATS claims will not require "unwarranted judicial interference in the conduct of foreign policy." Kiobel, 133 S. Ct. at 1664. The political branches already have indicated that the United States will not tolerate acts of torture, whether committed by United States citizens or by foreign nationals.

The plaintiffs do not appear to have access to federal courts under the Torture Victim Protection Act of 1991 (TVPA), presumably because they did not suffer injury "under actual or apparent authority, or color of law, of any foreign nation . . . ." Pub. L. No. 102-256, 106 Stat. 73, note following 28 U.S.C. § 1350 (emphasis added). Nevertheless, the TVPA's broad prohibition against torture reflects Congress's recognition of a "distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as

29

criminal liability) for a torturer or other common enemy of mankind." Kiobel, 133 S. Ct. at 1671 (Breyer, J., concurring in the judgment). This conclusion is reinforced by the fact that Congress has authorized the imposition of severe criminal penalties for acts of torture committed by United States nationals abroad. See 18 U.S.C. § 2340A. The Supreme Court certainly was aware of these civil and criminal statutes when it articulated its "touch and concern" language in Kiobel.[7] See Kiobel, 133 S. Ct. at 1669 (Kennedy, J., concurring) (predicting that "[o]ther cases may arise with allegations of serious violations of international law principles protecting persons" that are "covered neither by the TVPA nor by the reasoning and holding of today's case").

We conclude that the plaintiffs' ATS claims "touch and concern" the territory of the United States with sufficient force to displace the presumption against extraterritorial application based on: (1) CACI's status as a United States

_____

[7] We also note that ATS jurisdiction is not precluded by the fact that the alleged conduct occurred while the plaintiffs in this case were detained in the custody of the United States military. In Rasul v. Bush, the Supreme Court considered this issue with regard to detainees at Guantanamo Bay, Cuba, where the United States maintains a Naval Base under a treaty and a long-term lease with the government of Cuba. See 542 U.S. 466, 471 (2004). There, briefly addressing the jurisdiction of federal courts to consider the petitioners' ATS claims, the Court stated that "nothing . . . categorically excludes aliens detained in military custody outside the United States from [asserting an ATS claim] in U.S. courts." Id. at 484.

corporation; (2) the United States citizenship of CACI's employees, upon whose conduct the ATS claims are based; (3) the facts in the record showing that CACI's contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required CACI's employees to obtain security clearances from the United States Department of Defense; (4) the allegations that CACI's managers in the United States gave tacit approval to the acts of torture committed by CACI employees at the Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it; and (5) the expressed intent of Congress, through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.[8]  Accordingly, we hold that the district court erred in concluding that it lacked subject matter jurisdiction under the ATS, and we vacate the district court's judgment dismissing the plaintiffs' ATS claims on that basis.

---

[8] Because of our holding that the plaintiffs' ATS claims "touch and concern" the territory of the United States with sufficient force to displace the presumption against extraterritorial application, we need not address the plaintiffs' alternative argument that the relevant conduct did not occur within the territory of a foreign sovereign because the Abu Ghraib prison constituted the "de facto territory" of the United States.

B.

Our decision regarding the ATS answers only the first issue of subject matter jurisdiction presented in this appeal. We also must consider whether the record before us adequately supports a finding that litigation of the plaintiffs' ATS claims and common law tort claims will avoid any "political questions" that would place those claims outside the jurisdiction of the federal courts.

The political question doctrine is a "function of the separation of powers," and prevents federal courts from deciding issues that the Constitution assigns to the political branches, or that the judiciary is ill-equipped to address. Baker v. Carr, 369 U.S. 186, 217 (1982); see also Tiffany v. United States, 931 F.2d 271, 276 (4th Cir. 1991) (stating that the constitutional separation of powers "requires that we examine the relationship between the judiciary and the coordinate branches of the federal government cognizant of the limits upon judicial power"). The Supreme Court has defined a political question by reference to whether a case presents any of the following attributes: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" (2) "a lack of judicially discoverable and manageable standards for resolving it;" (3) "the impossibility of deciding without an initial policy determination of a kind

32

clearly for nonjudicial discretion;" (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;" (5) "an unusual need for unquestioning adherence to a political decision already made;" or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Baker, 369 U.S. at 217.

In considering these issues when a defendant challenges subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a court may evaluate the pleadings as evidence on the issue and may consider other evidence in the record "without converting the proceeding to one for summary judgment." Velasco v. Gov't of Indon., 370 F.3d 392, 398 (4th Cir. 2004) (citation omitted). "However, when the jurisdictional facts are inextricably intertwined with those central to the merits, the district court should resolve the relevant factual disputes only after appropriate discovery." In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 334 (4th Cir. 2014) (hereinafter Burn Pit) (quoting Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009) (brackets and internal quotation marks omitted)).

We first observe that CACI's position asserting the presence of a political question was resolved by the district court in the plaintiffs' favor much earlier in this litigation.

33

In March 2009, before any discovery had been conducted, CACI challenged the court's subject matter jurisdiction on political question grounds, based on the allegations in the complaint.

At that time, the district court analyzed the six factors set forth by the Supreme Court in Baker solely by reference to the plaintiffs' complaint, and rejected CACI's jurisdictional challenge. The court concluded that the case was not "constitutionally committed" to the executive branch because the case "challenges not the government itself or the adequacy of official government policies, but the conduct of government contractors carrying on a business for profit." Next, the court found that in view of the allegations of a conspiracy between "low-level contractors and military personnel," the court "could analyze this low-level conspiracy" without questioning the interrogation policies authorized by "top military and government officials."

The district court further concluded that there were "judicially discoverable and manageable standards" for evaluating the plaintiffs' claims, citing other "extensive" litigation regarding the events at Abu Ghraib prison, the availability of eyewitness testimony based on courts martial of military personnel, and the limited nature of any classified discovery material. The court stated that "manageable judicial standards are readily accessible through the discovery process,"

34

and that the court "suspect[ed] that the contract [between CACI and the government] details CACI's responsibilities in conducting the interrogations, outlines the applicable laws and rules that CACI personnel are bound by, and sets further restrictions on the type of conduct permitted."

The district court also noted that the process of reviewing CACI's conduct would not demonstrate a "lack of respect" for the political branches, because "matters are not beyond the reach of the judiciary simply because they touch upon war or foreign affairs." The court found that the case could be decided without the need for policy determinations clearly requiring "nonjudicial discretion," see Baker, 369 U.S. at 217, stating that "the policy determination central to this case has already been made; this country does not condone torture, especially when committed by its citizens." Finally, the court concluded that consideration of the other Baker factors did not render the case nonjusticiable, and held that the case did not present a political question barring the exercise of its subject matter jurisdiction.

Although CACI appealed the district court's ruling on numerous bases, including justiciability, our conclusion that we lacked jurisdiction over the interlocutory appeal under the collateral order doctrine returned the case to the district court without a decision whether the case presented a political

35

question.  See Al Shimari, 679 F.3d at 224.  On remand, the district court dismissed the plaintiffs' ATS claims for lack of jurisdiction under Kiobel, and also dismissed the plaintiffs' remaining common law tort claims under Federal Rule of Civil Procedure 12(b)(6).

In this appeal, CACI renews its political question challenge, contending that the treatment and interrogation of detainees during war is a key component of national defense considerations that are committed to the political branches of government.  CACI also asserts that there are no judicially discoverable standards for deciding intentional tort claims in the context of a war zone, and that CACI interrogators were performing a "common mission" with the military and were acting under direct military command and control.  CACI further maintains that most of the alleged forms of abuse at issue "were approved by the Secretary of Defense and incorporated into rules of engagement by military commanders at Abu Ghraib."

CACI's arguments are based on constitutional considerations and factual assertions that are intertwined in many respects. We begin our consideration of these arguments by recognizing that "most military decisions" are matters "solely within the purview of the executive branch," Taylor, 658 F.3d at 407 n.9, and that the Constitution delegates authority over military matters to both the executive and legislative branches of

36

government.  See Burn Pit, 744 F.3d at 334; Lebron v. Rumsfeld, 670 F.3d 540, 548 (4th Cir. 2012).

Nevertheless, the fact that a military contractor was acting pursuant to "orders of the military does not, in and of itself, insulate the claim from judicial review." Taylor, 658 F.3d at 411.  Accordingly, before declaring such a case "to be nonjusticiable, a court must undertake 'a discriminating analysis' that includes the litigation's 'susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.'" Lane v. Halliburton, 529 F.3d 548, 559 (5th Cir. 2008) (quoting Baker, 369 U.S. at 211-12).  Such an analysis involves a "delicate exercise in constitutional interpretation." Baker, 369 U.S. at 211.

Importantly, in the present case, more than five years have elapsed since the district court rendered its initial determination of justiciability.  During the intervening period, this Court has formulated a test for considering whether litigation involving the actions of certain types of government contractors is justiciable under the political question doctrine.  See Taylor, 658 F.3d at 411.

In our decision in Taylor, we adapted the Supreme Court's analysis in Baker to a particular subset of lawsuits, namely, those brought against government contractors who perform

37

services for the military. See Burn Pit, 744 F.3d at 334 (observing that Taylor "adapted Baker to the government contractor context through a new two-factor test"). The factual record in Taylor involved a soldier who was performing work on an electrical box at a military base in Iraq, and was electrocuted when an employee of a government contractor activated a nearby generator despite an instruction from military personnel not to do so. Taylor, 658 F.3d at 404. When the soldier sued the military contractor for negligence, the government contractor claimed that the case presented a nonjusticiable political question. Id.

In analyzing the justiciability of the soldier's negligence claim, we recognized the need to "carefully assess the relationship" between the military and the contractor, and to "gauge the degree to which national defense interests may be implicated in a judicial assessment" of the claim. Id. at 409-10. We distilled the six Baker factors into two critical components: (1) whether the government contractor was under the "plenary" or "direct" control of the military; and (2) whether national defense interests were "closely intertwined" with military decisions governing the contractor's conduct, such that a decision on the merits of the claim "would require the judiciary to question actual, sensitive judgments made by the military." Id. at 411 (quotation omitted). We noted that an

affirmative answer to either of these questions will signal the presence of a nonjusticiable political question. See Burn Pit, 744 F.3d at 335 (stating that under Taylor, a formal "Baker-style analysis" is not necessary, and that "if a case satisfies either factor [articulated in Taylor], it is nonjusticiable under the political question doctrine").

We further explained in Taylor that, in conducting this two-part inquiry, a court must "'look beyond the complaint, and consider how [the plaintiffs] might prove [their] claim[s] and how [the contractor] would defend." Taylor, 658 F.3d at 409 (quoting Lane, 529 F.3d at 565) (original brackets omitted) (alterations added) (emphasis in original). This determination requires consideration of the facts alleged in the complaint, facts developed through discovery or otherwise made a part of the record in the case, and the legal theories on which the parties will rely to prove their case.

In Taylor, we stated that "if a military contractor operates under the plenary control of the military, the contractor's decisions may be considered as de facto military decisions." 658 F.3d at 410. Based on the factual record presented in that case, we concluded that the military did not exercise "direct control" over the contractor because the record showed that responsibility for the manner in which the job was performed was delegated to the contractor. Id. at 411. In

39

drawing this conclusion, we relied on the parties' contract, which recited that "[t]he contractor shall be responsible for the safety of employees and base camp residents during all contractor operations," and that "the contractor shall have exclusive supervisory authority and responsibility over employees." Id. at 411.

We contrasted these facts with those reviewed in Carmichael v. Kellogg, Brown & Root Services, Inc., 572 F.3d 1271, 1275-79 (11th Cir. 2009), a case in which the plaintiff had sued a military contractor for negligence resulting from injuries sustained when the plaintiff's husband, a sergeant in the United States Army, was thrown from a vehicle in a military convoy that was driven by the contractor's employee. In deciding whether the case presented a political question, the Eleventh Circuit observed that there was no indication in the record that the contractor had any role in making decisions regarding the movement of the military convoy vehicle. Id. at 1282. Thus, the court held that the case was nonjusticiable, "[b]ecause the circumstances under which the accident took place were so thoroughly pervaded by military judgments and decisions, [and] it would be impossible to make any determination regarding [either party's] negligence without bringing those essential military judgments and decisions under searching judicial scrutiny." Id. at 1282-83. Because the facts in Taylor did not

40

manifest such "direct control" over the contractor's performance of its duties, we resolved this factor in the plaintiff's favor. 658 F.3d at 411.

Since our decision in Taylor, we have clarified that the critical issue with respect to the question of "plenary" or "direct" control is not whether the military "exercised some level of oversight" over a contractor's activities. Burn Pit, 744 F.3d at 339. Instead, a court must inquire whether the military clearly "chose how to carry out these tasks," rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed. Id. (emphasis added); see also Harris v. Kellogg Brown & Root Servs., Inc., 724 F.3d 458, 467 (3d Cir. 2013) (stating that plenary control does not exist when the military "merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion" because "contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions"); McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1359-61 (11th Cir. 2007) (holding that a contract for aviation services in Afghanistan did not manifest sufficient military control to present a political question because the contractor retained authority over the type of plane, flight path, and safety of the flight).

41

The second Taylor factor concerns whether "a decision on the merits . . . would require the judiciary to question actual, sensitive judgments made by the military." Taylor, 658 F.3d at 412 (internal quotation marks omitted). In analyzing this factor, a court must focus on the manner in which the plaintiffs might attempt to prove their claims, and how the defendants are likely to defend against those claims. See id. at 409. Addressing this issue in Taylor, we held that a political question was presented because a military contractor's contributory negligence defense to the plaintiff's common law negligence claim "would invariably require the Court to decide whether the Marines made a reasonable decision in seeking to install the wiring box," and would oblige the court to evaluate the reasonableness of military decisions. Id. at 411-12.

By contrast, in Burn Pit we analyzed a military contractor's "proximate causation" defense, in which the contractor maintained that the plaintiffs' alleged injuries were caused by military decisions and conduct. 744 F.3d at 340. After examining the record that the district court considered, we concluded that the contractor's causation defense would require an examination of the reasonableness of military decisions only if the case ultimately proceeded under the law of a state having a proportional-liability system that assigns liability based on fault. Id. at 340-41; see also Harris, 724

42

F.3d at 463 (holding that the contractor's assertion that the military was a proximate cause of the alleged injury did not present a political question under a joint-and-several liability regime, and that even if proportional liability applied, the plaintiffs could proceed on any damages claim that did not implicate proportional liability); Lane, 529 F.3d at 565-67 (concluding that the assertion of a causation defense to fraud and negligence claims did not necessarily implicate a political question).

In the present case, however, we do not have a factual record developed by the district court like the records considered in Taylor and in Burn Pit. And, from our review of the record before us, we are unable to determine whether a political question exists at this stage of the litigation.[9]

With respect to the first Taylor factor, the evidence in the record is inconclusive regarding the extent to which military personnel actually exercised control over CACI employees in their performance of their interrogation functions. CACI argues that military control is evidenced by the contract's

---

[9] We also observe that the United States has not sought to intervene or file an amicus brief with respect to the present appeal. We note, however, that during earlier proceedings in this case, the United States represented that "[t]he Court need not resolve defendants' political question arguments at this stage of the litigation." Brief for the United States as Amicus Curiae, Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (en banc) (Nos. 09-1335, 10-1891, 10-1921), at 9.

43

stipulation that CACI would provide services "as directed by military authority." CACI also cites a deposition in which a military officer stated that ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ According to that officer, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Finally, a military contracting officer declared that ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████

The plaintiffs argue in response that there was an absence of "direct control" by the military over the manner in which CACI's contract was to be performed, and that the contract language reflects a broad grant of discretion to CACI. See Taylor, 658 F.3d at 411. In support of their position, the plaintiffs point to the contract's statement that "[t]he Contractor is responsible for providing supervision for all contractor personnel," and that CACI was required to "supervise, coordinate, and monitor all aspects of interrogation

activities." The plaintiffs also note that the military officer upon whose testimony CACI relies ████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████

Additionally, the record lacks any evidence whether any of the alleged acts of abuse by CACI personnel ever were ordered, authorized, or approved by the United States military or by other governmental authority.

This limited record suggests that, at least for required interrogations, CACI interrogators may have been under the direct control of the military if they submitted and executed interrogation plans approved by the military, and if those interrogation plans detailed particular methods for treating detainees. However, based on the minimal evidence before us, we are unable to determine whether the actual content of any interrogation plans subjected the CACI interrogators to such direct control. We also are unable to determine the extent to which the military controlled the conduct of the CACI interrogators outside the context of required interrogations, which is particularly concerning given the plaintiffs' allegations that "[m]ost of the abuse" occurred at night, and

that the abuse was intended to "soften up" the detainees for later interrogations.

A thorough analysis of these matters, as mandated by Taylor, cannot be achieved simply by reviewing the plaintiffs' pleadings and the limited record on appeal, but also will require factual development of the record by the district court and possibly additional jurisdictional discovery. Therefore, we will remand this case to the district court for further consideration with respect to the application of the first Taylor factor of "direct control." See Burn Pit, 744 F.3d at 334 (noting that "when the jurisdictional facts are inextricably intertwined with those central to the merits, the district court should resolve the relevant factual disputes only after appropriate discovery").

We reach a similar conclusion with respect to the second Taylor factor, because the record does not reveal the defenses that the defendants intend to employ with regard to the merits of the plaintiffs' claims. Indeed, the district court has not yet identified the precise elements that the plaintiffs will be required to prove in their ATS claims for the alleged international law violations. Thus, we are unable to assess whether a decision on the merits would require the judiciary "to question actual, sensitive judgments made by the military." See Taylor, 658 F.3d at 411 (internal quotation marks omitted).

46

Although the plaintiffs' remaining common law tort claims are premised on familiar causes of action, which the district court thoroughly analyzed in its decision regarding the sufficiency of those claims under Federal Rule of Civil Procedure 12(b)(6), we do not know the degree to which CACI's defenses to these claims might implicate any political questions until the contours of all the plaintiffs' claims are further developed. We therefore refrain from reaching the additional issues presented on appeal regarding whether the plaintiffs' common law claims properly were dismissed under Rule 12(b)(6).[10]

Based on the issues we have identified that cannot be resolved on the present record, we are unable to perform a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling . . . , and of the possible consequences of judicial action." Baker, 369 U.S. at 211-12. Accordingly, we vacate the district court's dismissal of all four plaintiffs' common law tort claims, and instruct the district court to reexamine the justiciability of

---

[10] In remanding the plaintiffs' common law claims for further proceedings under Federal Rule of Civil Procedure 12(b)(1), we express no opinion regarding the correctness of the district court's dismissal of those claims under Federal Rule of Civil Procedure 12(b)(6).

the ATS claims and the common law tort claims before proceeding further in the case.

## III.

For these reasons, we vacate the district court's judgment and, consequently, the court's award of costs, and remand all the plaintiffs' claims for further proceedings in accordance with the principles expressed in this opinion.

VACATED AND REMANDED