**Suhail Najim Abdullah Al SHIMARI, et al., Plaintiff,**

**v.**

**CACI PREMIER TECHNOLOGY, INC., Defendant.**

**Case No. 1:08–cv–00827–GBL–JFA.**

United States District Court, E.D. Virginia, Alexandria Division.

Signed June 18, 2015.

George Brent Mickum, IV, Law Firm of George Brent Mickum IV, Bethesda, MD, John Kenneth Zwerling, Law Offices of John Zwerling, Alexandria, VA, for Plaintiff.

Savannah Elizabeth Marion, Conor Phillip Brady, Steptoe & Johnson LLP, Washington, DC, for Defendant.

## *ORDER*

GERALD BRUCE LEE, District Judge.

THIS MATTER is before the Court on Defendant CACI Premier Technology, Inc.'s ("CACI" or "CACI PT") Motion to Dismiss for Lack of Subject–Matter Jurisdiction (Doc. 516). This case concerns the civil tort claims of four Iraqi citizens alleg-

ing that CACI PT, a United States military government contractor, interrogators aided and abetted military soldiers who abused and tortured them during their detention at Abu Ghraib prison ("Abu Ghraib") in Iraq. Plaintiffs bring their claims under common law and international law, the latter by virtue of the Alien Tort Statute ("ATS").

This matter has been returned to this court on remand from the United States Court of Appeals for the Fourth Circuit for resolution of a dispositive issue. There is one multifaceted issue before the Court—whether the Court has subject-matter jurisdiction where Defendant asserts: (1) that Defendant was under the "plenary" and "direct" control of the military, and (2) that national defense interests are so "closely intertwined" with the military decisions governing Defendant's conduct, such that a decision on the merits "would require the judiciary to question actual, sensitive judgments made by the military." The Court holds that it does not have subject-matter jurisdiction over this matter because after analyzing the Complaint and other documents in the record, as instructed by the Fourth Circuit in *Al Shimari II, Al Shimari III,* and *Taylor,* the Court holds that Defendant was under the "plenary" and "direct" control of the military and that national defense interests are so "closely intertwined" with the military decisions governing Defendant's conduct, such that a decision on the merits would require this Court to question actual, sensitive judgments made by the military. Specifically, as to plenary and direct control, the Court holds that based on the discoverable evidence presented, it is clear from the testimony of military personnel that the military controlled *how* Defendant performed the tasks of interrogating detainees at Abu Ghraib. Additionally, the Court holds that a decision as to the merits of the torture and conspiracy claims alleged in Plaintiffs' Complaint would require the Court to question the sensitive judgments of the military. Finally, the Court also holds that it lacks any judicially manageable standards to adjudicate the merits of this case, including Plaintiffs' ATS claims where, for instance, the Court would have to apply Iraqi law and to determine whether Plaintiffs were "innocent civilians."

## I. BACKGROUND AND PROCEDURAL HISTORY

The Court, now adjudicating this case for a third time, finds little reason to provide a detailed recitation of the intricate procedural history of this matter. Now entering its ninth year of pendency, this litigation and its procedural posture result from multiple transfers from various district courts, case consolidation, and numerous pretrial motions, including dispositive motions to dismiss various parties and claims, which have resulted in multiple decisions of this Court. *See Al Shimari v. CACI Int'l, Inc.,* 951 F.Supp.2d 857 (E.D.Va.2013); *Al Shimari v. CACI Int'l, Inc.,* 933 F.Supp.2d 793 (E.D.Va.2013); *Al Shimari v. CACI Premier Tech., Inc.,* 657 F.Supp.2d 700 (E.D.Va.2009); *Al Shimari v. CACI Int'l, Inc.,* No. 1:08cv827, 2008 WL 7348184 (E.D.Va. Nov. 25, 2008). The case has also been before the United States Court of Appeals for the Fourth Circuit three times. *See Al Shimari v. CACI Premier Tech., Inc. (Al Shimari III),* 758 F.3d 516 (4th Cir.2014); *Al Shimari v. CACI Int'l, Inc. (Al Shimari II),* 679 F.3d 205 (4th Cir.2012) (en banc); *Al Shimari v. CACI Int'l, Inc. (Al Shimari I),* 658 F.3d 413 (4th Cir.2011) *on reh'g en banc,* 679 F.3d 205 (4th Cir.2012). Though the procedural history may not be worthy of lengthy recitation, the allegations un-

derlying Plaintiffs' Complaint are still shocking enough to bear mentioning.

In response to the September 11, 2001 attacks, a multinational coalition force led by troops from the United States and Great Britain invaded Iraq on March 20, 2003. *Al Shimari v. CACI Premier Tech., Inc.*, 657 F.Supp.2d 700, 705 (E.D.Va.2009). After the invasion, the United States military took over the Abu Ghraib prison and used it to detain and interrogate persons thought to have information about the anti-Coalition insurgency. *Al Shimari II*, 679 F.3d at 209. The United States contracted with CACI International and CACI PT to help the military interrogate and communicate with these detainees. *Id.* In the spring of 2004, a well-publicized prison abuse scandal revealed that "detainees at the 'hard site' within Abu Ghraib prison were brutally tortured and abused." (3d Am. Compl. ¶ 1, Doc. 254.)

This case arises out of the detention and alleged abuse of four Iraqi citizens detained at Abu Ghraib between September 22, 2003, and November 7, 2003. (3d Am. Compl. ¶¶ 4–7, 11, 24–77.) Plaintiffs are Suhail Najim Abdullah Al Shimari, Taha Yaseen Arraq Rashid, Asa'ad Hamza Hanfoosh Al–Zuba'e, and Salah Hasan Nsaif Jasim Al–Ejaili. (*Id.* ¶¶ 4–7.) All four Plaintiffs were released from Abu Ghraib between February 1, 2004, and March 27, 2008, without ever being charged with any crime. (*Id.* ¶¶ 38, 58, 67, 77.)

On June 30, 2008, Plaintiffs filed this action against Defendants: CACI International, a Delaware corporation with its headquarters in Arlington, Virginia; CACI PT, its wholly-owned subsidiary located in Arlington, Virginia; L–3 Services, Inc., a publicly traded Delaware corporation with headquarters in Alexandria, Virginia; and

Timothy Dugan, a former CACI employee.[1] (*See* Compl. ¶¶ 5–9, Doc. 2; 3d Am. Compl. ¶¶ 8–9, Doc. 251.) Plaintiffs allege that CACI employees, including Steven Stefanowicz, Daniel Johnson, and Timothy Dugan, conspired with each other, CACI, and military personnel to torture and inflict harm on Plaintiffs and other detainees. (3d Am. Compl. ¶ 78.)

Prior to the current motion, Defendant CACI PT filed a Motion for Reconsideration, or in the alternative Motion to Dismiss Plaintiffs' Alien Tort Statute Claims (Doc. 354), and a Motion to Dismiss Plaintiffs' Third Amended Complaint for Failure to State a Claim (Doc. 363). On June 25, 2013, this Court granted Defendants' motions, holding that it lacked jurisdiction over Plaintiffs' ATS claims because the acts giving rise to those tort claims occurred exclusively in Iraq—a foreign sovereign. (Doc. 460; *Al Shimari v. CACI Int'l, Inc.*, 951 F.Supp.2d 857 (E.D.Va. 2013)). The Court held that jurisdiction was circumscribed by the Supreme Court's holding in *Kiobel v. Royal Dutch Petroleum*, —— U.S. ——, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), whereby the Supreme Court ruled that there was a presumption against the extraterritorial application of acts of Congress. *Id.* Additionally, this Court held that Iraqi law applied to Plaintiff Al Shimari's common law claims and that the governing laws during the relevant time, which were promulgated by the Coalition Provision Authority, provided immunity from suit to contractors for activities related to the terms and conditions of their contracts. *Id.* Plaintiffs timely appealed this Court's ruling to the United States Court of Appeals for the Fourth Circuit. (Doc. 461.)

---

1. CACI Premier Technology, Inc. is the only Defendant remaining in the case. (3d Am. Compl., Doc. 254)

On appeal, the Fourth Circuit vacated and remanded. (Doc. 482; *Al Shimari III*, 758 F.3d at 537). The Fourth Circuit held that Plaintiffs' claims "touched and concerned" the territory of the United States with sufficient force to rebut the presumption against the extraterritorial application of the ATS. *Id.* at 530–31. Moreover, the Fourth Circuit remanded the matter for further factual development of the record so that the district court could determine whether the military exerted "direct control" over how contractors interacted with Plaintiffs, such that the court would lack subject-matter jurisdiction on political question grounds. *Id.* at 520. The Parties have now developed the record and further briefed the issue of whether this case presents a nonjusticiable political question. Defendant's Motion to Dismiss for Lack of Subject–Matter Jurisdiction (Doc. 516) is now properly before the Court.

## II. STANDARD OF REVIEW

■■■■ Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when the court lacks subject-matter jurisdiction over the action. Fed. R.Civ.P. 12(b)(1). The burden is on the plaintiff to show that federal subject-matter jurisdiction is proper. *See United States v. Hays*, 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). There are two ways in which a defendant may challenge a court's subject-matter jurisdiction under Rule 12(b)(1). First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *Adams*, 697 F.2d at 1219. In such a case, all facts as alleged by the plaintiff are assumed to be true. *Id.* Alternatively, a Rule 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir.1995) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)); *White v. CMA Constr. Co.*, 947 F.Supp. 231, 233 (E.D.Va. 1996). In that instance, the court's "very power to hear the case" is at issue. *Mortensen*, 549 F.2d at 891.

■■■■ Where subject-matter jurisdiction is being attacked apart from the pleadings, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* Additionally, "the district court may regard the pleadings as mere evidence on the issue [of jurisdiction] and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir.2004); *see Thigpen v. United States*, 800 F.2d 393, 396 (4th Cir.1986) ("In contrast to its treatment of disputed issues of fact when considering a Rule 12(b)(6) motion, a court asked to dismiss for lack of jurisdiction may resolve factual disputes to determine the proper disposition of the motion."). The district court is then free to weigh the evidence to determine the existence of jurisdiction. *Adams*, 697 F.2d at 1219. However, "when the jurisdictional facts are inextricably intertwined with those central to the merits, the [district] court should resolve the relevant factual disputes only after appropriate discovery." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir.2009). Where a court determines that a nonjusticiable question is presented it must dismiss the action. Fed.R.Civ.P. 12(h)(3).

## III. DISCUSSION

The Court GRANTS Defendant CACI PT's Motion to Dismiss for Lack of Subject–Matter Jurisdiction for two reasons. First, because Defendant was under the "plenary" and "direct" control of the military. Second, because national defense interests are so "closely intertwined" with the military decisions governing Defendant's conduct that a decision on the merits "would require this Court to question actual, sensitive judgments made by the military."

### A. Political Question Doctrine

■ "The political question doctrine, at its core, recognizes as nonjusticiable any question whose resolution is committed to a coordinate branch of government and whose evaluation by a court would require the application of standards judicially undiscoverable or judicially unmanageable." *Al Shimari I,* 658 F.3d at 421; *see Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Vieth v. Jubelirer,* 541 U.S. 267, 277, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004). In *Baker,* the hallmark political question doctrine case, the Supreme Court set forth the boundaries of the political question doctrine. *Baker,* 369 U.S. at 209, 82 S.Ct. 691. The Court defined a political question as any case that presented one of the following attributes: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" (2) "a lack of judicially discoverable and manageable standards for resolving it;" (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;" (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;" (5) "an unusual need for unquestioning adherence to a political decision already made;" or (6) "the potentiality of embarrassment

from multifarious pronouncements by various departments on one question." *Baker,* 369 U.S. at 217, 82 S.Ct. 691.

■ Unless one of the six *Baker* "formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." *U.S. Dep't of Commerce v. Montana,* 503 U.S. 442, 456, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992) (quoting *Baker,* 369 U.S. at 217, 82 S.Ct. 691). Accordingly, before declaring a case "to be nonjusticiable, a court must undertake 'a discriminating analysis'" that includes the litigation's "susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Lane v. Halliburton,* 529 F.3d 548, 559 (5th Cir. 2008) (quoting *Baker,* 369 U.S. at 211–12, 82 S.Ct. 691). Such an analysis involves a "delicate exercise in constitutional interpretation." *Baker,* 369 U.S. at 211, 82 S.Ct. 691.

■ The Constitution commits the command of our armed forces to the President of the United States, as "Commander in Chief." U.S. Const. art. II, § 2. Moreover, federal courts lack the expertise and information necessary for the proper evaluation of military tactics. *Tiffany v. United States,* 931 F.2d 271, 278 (4th Cir.1991) (citing *Rappenecker v. United States,* 509 F.Supp. 1024, 1029 (N.D.Cal.1980)). Consequently, military judgments are often shielded from judicial review by the political question doctrine. *Taylor v. Kellogg Brown & Root Servs., Inc.,* No. CIV. 2:09CV341, 2010 WL 1707530, at *4 (E.D.Va. Apr. 16, 2010), *as amended* (Apr. 19, 2010), *aff'd in part, vacated in part,* 658 F.3d 402 (4th Cir.2011). This is not to say, however, that "all cases involving the military are automatically foreclosed by the political question doctrine." *Carmi-*

*chael v. Kellogg, Brown & Root Servs.*; 572 F.3d 1271, 1281 (11th Cir.2009). A court must "look beyond the complaint, considering how [Plaintiff] might prove [his] claims and how [Defendant] would defend." *Lane*, 529 F.3d at 565.

In *Taylor v. Kellogg Brown & Root Services, Inc.*, the Fourth Circuit formulated a test for considering whether litigation involving the actions of certain types of government contractors is justiciable under the political question doctrine. *See Taylor*, 658 F.3d at 411. The court adapted the Supreme Court's analysis in *Baker* to a particular subset of lawsuits, namely, those brought against government contractors who perform services for the military. *See In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 334 (4th Cir.2014) (observing that *Taylor* "adapted *Baker* to the government contractor context through a new two-factor test"). *Taylor* involved a soldier who was performing work on an electrical box at a military base in Iraq when he was electrocuted after an employee of a government contractor activated a nearby generator despite an instruction from military personnel not to do so. 658 F.3d at 404. When the soldier sued the military contractor for negligence, the government contractor claimed that the case presented a nonjusticiable political question. *Id.*

In analyzing the justiciability of the soldier's negligence claim in *Taylor*, the Fourth Circuit distilled the six *Baker* factors into two critical components: (1) whether the government contractor was under the "plenary" or "direct" control of the military; and (2) whether national defense interests were "closely intertwined" with military decisions governing the contractor's conduct, such that a decision on the merits of the claim "would require the judiciary to question actual, sensitive judgments made by the military." *Id.* at 411 (internal quotation marks omitted). The

court noted that an affirmative answer to either of these questions will signal the presence of a nonjusticiable political question. *See Burn Pit*, 744 F.3d at 335 (stating that under *Taylor*, a formal "*Baker* style analysis" is not necessary, and that "if a case satisfies either factor [articulated in *Taylor*], it is nonjusticiable under the political question doctrine").

The court further explained in *Taylor* that, "if a military contractor operates under the plenary control of the military, the contractor's decisions may be considered as de facto military decisions." 658 F.3d at 410. Based on the factual record presented in that case, the court concluded that the military did not exercise "direct control" over the contractor because responsibility for the manner in which the job was performed was delegated to the contractor. *Id.* at 411. The second *Taylor* factor concerns whether "a decision on the merits ... would require the judiciary to question actual, sensitive judgments made by the military." *Id.* at 411 (internal quotation marks omitted). This factor requires a court to consider how both parties are likely to prove and/or defend their respective claims. *See id.* at 409.

As the Fourth Circuit found in *Al Shimari III:*

> ... CACI's position asserting the presence of a political question was resolved by the district court in the plaintiffs' favor much earlier in this litigation. In March 2009, before any discovery had been conducted, CACI challenged the court's subject matter jurisdiction on political question grounds, based on the allegations in the complaint.
>
> At that time, the district court analyzed the six factors set forth by the Supreme Court in *Baker* solely by reference to the plaintiffs' complaint, and rejected CACI's jurisdictional challenge. The court concluded that the case was not

"constitutionally committed" to the executive branch because the case "challenges not the government itself or the adequacy of official government policies, but the conduct of government contractors carrying on a business for profit." Next, the court found that in view of the allegations of a conspiracy between "low-level contractors and military personnel," the court "could analyze this low-level conspiracy" without questioning the interrogation policies authorized by "top military and government officials."

\* \* \*

The district court also noted that the process of reviewing CACI's conduct would not demonstrate a "lack of respect" for the political branches, because "matters are not beyond the reach of the judiciary simply because they touch upon war or foreign affairs." The court found that the case could be decided without the need for policy determinations clearly requiring "nonjudicial discretion," *see Baker*, 369 U.S. at 217, 82 S.Ct. 691, stating that "the policy determination central to this case has already been made; this country does not condone torture, especially when committed by its citizens." Finally, the court concluded that consideration of the other *Baker* factors did not render the case nonjusticiable, and held that the case did not present a political question barring the exercise of its subject matter jurisdiction.

758 F.3d at 532. The Court now considers the applicability of the political question doctrine in light of *Taylor* as instructed by the Fourth Circuit.

### 1. Plenary or Direct Control

■] The Court grants Defendant's Motion to Dismiss Plaintiffs' claims because they present a nonjusticiable political question, here where the military exercised "plenary" and "direct" control over how Defendant interrogated detainees at Abu Ghraib.

■ In *Taylor*, the Fourth Circuit distilled the six *Baker* factors into two critical components. The first prong of the two-part test is whether the government contractor was under the "plenary" or "direct" control of the military. Moreover,

[s]ince its decision in *Taylor*, the Fourth Circuit has further clarified that the critical issue with respect to the question of "plenary" or "direct" control is not whether the military "exercised some level of oversight" over a contractor's activities. *Burn Pit*, 744 F.3d at 339. Instead, a court must inquire whether the military clearly "chose *how* to carry out these tasks," rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed. *Id.* (emphasis added); *see also Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 467 (3d Cir.2013) (stating that plenary control does not exist when the military "merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion" because "contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions"); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359–61 (11th Cir.2007) (holding that a contract for aviation services in Afghanistan did not manifest sufficient military control to present a political question because the contractor retained authority over the type of plane, flight path, and safety of the flight).

*Al Shimari III*, 758 F.3d at 534–35.

As previously noted, when determining whether it has subject-matter jurisdiction pursuant to the political question doctrine,

a court may resolve factual disputes to determine the proper disposition of the motion. Here, Parties disagree as to the factual background of the case, particularly as to whether Defendant or the U.S. military controlled how detainees were interrogated.

Defendant asserts that the U.S. military chain of command exercised total control over how military and civilian interrogators performed the interrogation mission at Abu Ghraib. In support of this proposition, Defendant offers the sworn declarations of two top military officials—Colonel William Pappas and Colonel William Brady,[2] both of whom were involved in the mission at Abu Ghraib. (Doc. 518–1; Exs. 2–3.) These declarations strongly suggest that at all times the U.S. military maintained "plenary" and "direct" control over CACI PT employees. Notably, a CACI PT interrogator could not join a Tiger team[3] without military approval. (Doc. 518–1; Exs. 2–5.) After a CACI PT employee was placed on a team, the military chain of command controlled all aspects of the interrogation and CACI interrogators were ultimately subjected to the same treatment as military personnel. (*See* Doc. 518–1; Ex. 3.)

Further, CACI PT interrogators were expected to report to their section sergeant and other military personnel as part of their duties. (Doc. 518–1; Exs. 2–5.) Major Holmes testified that there were no differences in the chain of command for military and civilian interrogators as it related to the day-to-day mission operations. (Doc. 518–1; Ex. 5.) Testimony did reveal, however, that there was a CACI PT site lead, but that this person primarily per-

formed administrative duties and made no operational decisions. (Doc. 518–1; Ex. 3.) Markedly, Colonel Pappas testified that "[i]n all respects, CACI PT interrogators were subject to the operational control of the U.S. military," and that "CACI PT interrogators were fully integrated into the Military Intelligence mission and [were] operationally indistinguishable from their military counterparts." (Doc. 518–1; Ex. 3 at ¶¶ 8–9.) The declaration of Colonels Pappas and Brady, along with the deposition testimony of other military personnel, are convincing as to who maintained the chain of command at Abu Ghraib—the military.

Defendant further argues that the military exclusively controlled all aspects of interrogations at Abu Ghraib. Colonel Pappas testified that "[t]he military decided where each detainee would be incarcerated within Abu Ghraib prison, which detainees would be interrogated, and who would conduct the interrogations of a given detainee." (Doc. 518–1; Ex. 3 at ¶ 10.) Other testimony in the record further suggests that the military had to approve all interrogation plans and that the military also monitored interrogations. (*See* Doc. 518–1; Exs. 2–9.) The record also makes clear that the military was solely responsible for establishing permissible interrogation techniques. (*Id.*)

As further evidence of the military's control, CACI PT's contracts show that the military was to have plenary and direct control. Specifically, Defendant calls our attention to Delivery Orders 35 and 71. (*See* Doc. 518–1; Exs. 15–16.) The operative contract provisions suggest that CACI personnel would be integrated into teams

---

**2.** Defendant also provides excerpts from several depositions in support of its Motion, including: Major Carolyn Holmes, Ivan Frederick, Charles Graner, Megan Graner, and Sabrina Harman. (Doc. 518–1; Exs. 5–9.)

**3.** A Tiger team was a military interrogation unit. (Doc. 518–1; Ex. 3 at ¶ 8.)

formed prior to their arrival. (*Id.*) The provisions further provide that CACI employees would "perform under the direction and control of the unit's MI chain of command or Brigade S2, as determined by the supported command." (*Id.*)

■ Plaintiffs contend that any contested issues of jurisdictional fact are so interwoven with the merits that the Court cannot resolve them at the motion to dismiss stage. Plaintiffs cite *Kerns v. United States* and several other Fourth Circuit cases for the proposition that: "[W]hen the jurisdictional facts and the facts central to a tort claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues." 585 F.3d 187, 193 (4th Cir.2009). However, Plaintiffs ignore a key segment of the *Kerns* decision. Specifically, the court in *Kerns* found that "when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and *resolve the disputed jurisdictional facts.*" *Id.* at 193 (emphasis added). Just as important, the court in *Kerns* went on to find that "when the jurisdictional facts are inextricably intertwined with those central to the merits, *the court should resolve the relevant factual disputes only after appropriate discovery.*" *Id.* (emphasis added). Thus, even if the Court found that the jurisdictional facts were interwoven, the Court would be permitted to resolve those factual disputes after granting the appropriate discovery. Here, the Parties were undeniably granted discovery on this very issue. Accordingly, the Court is not persuaded by Plaintiffs' assertion that the issues of jurisdictional facts are so interwoven with the merits that the Court cannot resolve them at the motion to dismiss stage.

Additionally, none of the cases Plaintiffs rely on present the issue of interwoven jurisdictional facts in the context of a political question. This distinction is significant as the Fourth Circuit has clearly instructed the Court to decide the issue of direct control at this juncture. *See Al Shimari III*, 758 F.3d at 535–36 ("With respect to the first *Taylor* factor, the evidence in the record is inconclusive regarding the extent to which military personnel actually exercised control over CACI employees in their performance of their interrogation functions.... Therefore we will remand this case to the district court for further consideration with respect to the application of the first *Taylor* factor of 'direct control.' ").

Though not binding, the Court finds support for its decision on control in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C.Cir.2009). In *Saleh*, Iraqi nationals, or their widows, brought actions against two American companies that contracted to provide interrogators or interpreters to the U.S. military, arising out of the alleged infliction of abusive treatment or torture while plaintiffs, or their decedents, were detained by U.S. military forces at an Iraqi prison. *See generally id.* Plaintiffs alleged numerous claims under, among other things, the ATS and various common law tort claims. *Id.* at 3. The "district judge fashioned a test of first impression, according to which this preemption defense attaches only where contract employees are 'under the direct command and *exclusive* operational control of the military chain of command.' " *Id.* at 4 (citing *Ibrahim v. Titan Corp.*, 556 F.Supp.2d 1, 5 (D.D.C.2007) (emphasis added)). The district court concluded "that Titan's employees were fully integrated into [their] military units," and essentially functioned "as soldiers in all but name." *Id.* The Court of Appeals for the District of Columbia Circuit found that the "district

judge properly focused on the chain of command and the degree of integration that, in fact, existed between the military and both contractors' employees rather than the contract terms." *Id.* Accordingly, the circuit court affirmed the district court's findings in that regard. *Id.* The circuit court somewhat disagreed, however, with the district court's required showing of "exclusive" operational control. *Id.* The circuit court found "that [the government contractor's] employees were expected to report to their civilian supervisors, as well as the military chain of command, any abuses they observed and that the company retained the power to give advice and feedback to its employees, does not, in our view, detract meaningfully from the military's operational control, nor the degree of integration with which CACI's employees were melded into a military mission." *Id.* at 4–5.

Moreover, the Court must also consider the significance of subject-matter jurisdiction. Subject-matter jurisdiction is a threshold procedural hurdle—the Court must have jurisdiction in order to determine the merits of a case. The Supreme Court has long held that disputes involving political questions lie outside of the Article III jurisdiction of federal courts. *See Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 215, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ("[T]he concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies . . . [the] political question doctrine[ ].") (citing *Flast v. Cohen,* 392 U.S. 83, 93, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)); *see also Schneider v. Kissinger,* 412 F.3d 190, 193 (D.C.Cir. 2005) ("The principle that the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary is as old as the fundamental principle of

judicial review.") (internal quotation marks omitted); *No GWEN Alliance of Lane Cnty., Inc. v. Aldridge,* 855 F.2d 1380, 1382 (9th Cir.1988) ("[T]he presence of a political question precludes a federal court, under [A]rticle III of the Constitution, from hearing or deciding the case presented.").

As a threshold matter, the Court finds that it may and must resolve the relevant factual disputes as to control in order to determine the applicability of the political question doctrine. The Court finds that the record demonstrates that the military maintained control over all relevant aspects of Abu Ghraib, including the manner in which interrogations were carried out. Because the Court finds the Pappas declaration and other testimony presented by Defendant persuasive, it follows that the Court finds that the military exercised "plenary" and "direct" control over *how* Defendants interrogated detainees at Abu Ghraib. The military clearly chose *how* to carry out tasks related to the interrogation mission, while CACI had no discretion in any operational matters. Because the Court finds that the military exercised direct control over CACI and its employees in the execution of all operational mission related activities, the Court dismisses this case for lack of subject-matter jurisdiction where it presents a nonjusticiable political question.

### 2. Require Judiciary to Question Military's Judgment

Even were the Court to find that the military did not exercise direct or plenary control over CACI employees, the Court would grant Defendant's Motion to Dismiss Plaintiffs' claims because they also fail the second prong of the *Taylor* test.

The second prong of the *Taylor* test requires the Court to consider whether national defense interests are so "closely intertwined" with military decisions gov-

erning the contractor's conduct, such that a decision on the merits of the claim "would require the judiciary to question actual, sensitive judgments made by the military." 658 F.3d at 411 (internal citations omitted). Here, the answer is yes. To consider Plaintiffs' claims would require the Court to impose "state tort duties onto an active war zone, raising a broad array of interferences by the judiciary into the military functions textually committed by our Constitution to Congress, the President, and the Executive Branch." *Al Shimari II*, 679 F.3d at 268 (Niemeyer, J., dissenting) (citing U.S. Const. art. I, § 8, cls. 11–14 (authorizing Congress to declare war, to raise armies and create a navy, and to make rules for the military)).

During the period of war relevant to Plaintiffs' allegations, "there was, to be sure, a debate within the Executive Branch about what were morally appropriate techniques and what could be justified by military necessity." *Al Shimari I*, 658 F.3d at 424. These questions, like so many others asked during the aftermath of September 11, 2001, "were not addressed by applying standards that were judicially cognizable; they were difficult judgments that involved a delicate weighing of public policy, the public sense of morality, public decency, the customs of war, international treaties, and military necessity." *Id.* There could hardly be a question more unsuited for the judiciary. *Id.*

As Judge Neimeyer so pointedly stated in *Al Shimari I*:

> To engage a court in the question of which techniques were militarily necessary but yet morally acceptable and consistent with American policy, at least as defined by the President and Congress, would require a court to exercise the very powers committed to those branches. The military necessity of actions in

the war zone, including battlefield interrogations of detainees, cannot be explored by a court without requiring it to evaluate judgments about which the judiciary lacks expertise and competence. For a court to evaluate military policy that interrogation had to be more aggressive, that "the gloves are coming off," and that "these detainees must be broken," it would have to evaluate the entire basis for the military decisions or be at a loss as to where to begin. Such questions go to the heart of the political question doctrine.

> \* \* \*

> A court's attempt to evaluate the disobedient activities of CACI employees would inappropriately enmesh the court into military strategies, decisions, and activities to the same extent as if they were undertaken entirely by military personnel. The political question doctrine recognizes that the Constitution assigns such matters to Congress, the Commander in Chief, and the Executive Branch generally. *See Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) ("Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense.... The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

*Id.* at 424–25. The Court agrees.

This matter would involve questioning sensitive military judgments and accordingly would run afoul of the political question doctrine. As the court noted in *Taylor*, courts must be wary where plaintiff's "claim would require the judiciary to question actual, sensitive judgments" made by the armed forces. 658 F.3d at 411 (internal quotation marks omitted). Cases that require courts to second-guess these decisions run the risk not just of making bad

law, but also of "imping[ing] on explicit constitutional assignments of responsibility to the coordinate branches of our government." *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir.2012). Because the Court finds that the military exercised direct control, it follows that CACI's decisions may be considered de facto military, to which the Court is not at liberty to question. *See Taylor*, 658 F.3d at 410.

A recent Fourth Circuit opinion exploring the political question doctrine, though not involving ATS claims, is also instructive. In *Wu Tien Li–Shou v. United States*, 777 F.3d 175 (4th Cir.2015), a Taiwanese citizen brought an action against the United States for damages arising from the killing of her husband and the sinking of his fishing vessel during a North Atlantic Treaty Organization (NATO) counter-piracy mission. The United States District Court for the District of Maryland granted the government's motion to dismiss on the political question and discretionary function doctrines. *Id.* at 179. Plaintiff appealed.

The Fourth Circuit affirmed, holding that "[b]ecause allowing this action to proceed would thrust courts into the middle of a sensitive multinational counter-piracy operation and force courts to second-guess the conduct of a military engagement, we agree that the separation of powers prevents the judicial branch from hearing the case." *Id.* The court went on to state that "[r]esolving this dispute would oblige the district court to wade into sensitive and particularized military matters." *Id.* at 180. Further, the court noted that "[t]he case would not need to proceed to trial for the court to find itself enmeshed in this rigging. Discovery easily could draw the court and the parties into the technicalities of battle, with subpoenas issuing to NATO and American commanders on down to the Gunnery Direction Officer." *Id.* The court

went on to analyze the complications presented when judiciary questions military judgment. Specifically, the Fourth Circuit found:

As judges, we are just not equipped to second-guess such small-bore tactical decisions. We also are ill-suited to evaluate more strategic considerations. We do not know the waters. We do not know the respective capabilities of individual pirate ships or naval frigates. We do not know the functionality and limitations of the counter-piracy task force's assets. We do not know how a decision to tow and not to sink the JCT 68 would have affected the task force's mission by tying down valuable naval resources. We do not know the extent of the disruption to commercial shipping caused by any single ship or by Somali-based piracy generally. What we do know is that we are not naval commanders. These are questions not intended to be answered through the vehicle of a tort suit.

That is not all. This case threatens to involve the courts in the command structures of both the U.S. military and Operation Ocean Shield. [ ] Specifically, she asserts that Navy vessels involved in what Wu terms as law enforcement "are governed by the law enforcement parameters set down by the U.S. Coast Guard." [ ] But selecting the proper rules of military engagement is decidedly not our job. This request that we do so encourages the courts to bull their way into the chain of command of a multinational operation. In fact, Wu would have us sit astride the top of the command pyramid and decree the proper counter-piracy strategies and tactics to the NATO and American commanders below.

*Id.* at 181. The court's pronouncement in *Wu* is helpful in analyzing the second *Taylor* factor in the present case.

Similar to *Wu,* here, the Court is simply unequipped to second-guess the military judgments in the application or use of extreme interrogation measures in the theatre of war. The Court is simply not equipped to make judgments as to whether the techniques approved by the military were appropriate—a judgment that would no doubt come into question during adjudication of the merits of this case. The Court also agrees that, "selecting the proper rules of military engagement is decidedly not our job." *Id.* Plaintiffs assert twenty claims against Defendant, including torture, war crimes, and CIDT. In each instance, Defendants would likely defend against the allegations by asserting that their actions were ordered by the military. Accordingly, the Court would have to consider whether military judgments were proper. As the Eleventh Circuit has noted, "judicial intrusion into military practices would impair the discipline that the courts have recognized as indispensable to military effectiveness." *Aktepe v. United States,* 105 F.3d 1400, 1404 (11th Cir.1997).

Therefore, the Court would likewise dismiss Plaintiffs' claims because the national defense interests are so closely intertwined with military decisions governing Defendant's conduct, such that a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the military, which the Court is not permitted to do. Plaintiffs' claims present a nonjusticiable political question, because they fail both the first and second prongs of the *Taylor* test

### B. Judicially Manageable Standards

While the Court has determined that Plaintiffs' claim present a nonjusticiable political question under both *Taylor* factors, even were the Court to find jurisdiction on those grounds, Plaintiffs' claims could not be adjudicated because the case lacks judicially manageable standards.

■ The Court, in determining jurisdiction, must also consider whether prudential considerations counsel against judicial intervention in this matter, or in other words, whether there are judicially manageable standards to decide this dispute. *See Al Shimari I,* 658 F.3d at 422 (Niemeyer, J., concurring) (citing *Goldwater v. Carter,* 444 U.S. 996, 998, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Powell, J., concurring)). As previously discussed, a controversy is nonjusticiable where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it...." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691. These two concepts are not completely separate, however—the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch. *Nixon v. U.S.,* 506 U.S. 224, 228–29, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993).

■ Judicial action must be "governed by *standard,* by *rule* "—or, put differently, federal courts must be able to proceed in a "principled, rational, and ... reasoned" fashion. *Vieth v. Jubelirer,* 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion). Unless judicially manageable standards for decision exist, a court may not intervene. *Id.; see also Zivotofsky v. Clinton,* —— U.S. ——, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012). Here, there are no such judicially manageable standards available to the Court.

■ As Judge Wilkinson observed in *Al Shimari II,* this suit presents the "difficult question of whose law should govern." 679 F.3d at 227 (Wilkinson, J., dissenting). In his dissent, Judge Wilkinson shed light

on the issue of what might be the applicable law, especially in factually similar cases brought in different jurisdictions. *Id.* Judge Wilkinson described the idea of Iraqi law being applied by a Virginia (or Maryland) court as "highly troublesome." *Id.* at 228. Judge Wilkinson found that "American courts are ill-suited to decide unsettled questions of Iraqi law." *Id.* This Court agrees. The Court's lack of expertise in matters of foreign law, in addition to the difficulty of adducing the boundaries and elements of those foreign laws, further emphasizes the lack of judicially manageable standards in this case.

The additional ambiguity surrounding the elements of each of Plaintiffs' ATS claims also lends itself to a determination that judicially manageable standards are lacking in this matter. The elements of each claim are necessary at the very least to instruct the jury.

### 1. Elements of ATS Claims

 Plaintiffs must first prove the existence of international norms and the elements of purported ATS claims at the time of the conduct alleged. A determination as to whether a particular international norm is sufficiently "specific, universal, and obligatory" as to be cognizable under ATS is determined based on international norms existing at the time of the conduct at issue in the case. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104, 119 (2d Cir.2008) (rejecting claims relating to use of Agent Orange because the claims did not involve universally-recognized violations of international law at the time of the conduct alleged); *Hereros v. Deutsche Afrika–Linien Gmblt & Co.,* 232 Fed.Appx. 90, 95 (3d Cir.2007) (rejecting ATS claims arising between 1890 and 1915 because the conduct alleged did not violate a universally recognized norm of international law at that time); *cf. Padilla v. Yoo,* 678 F.3d 748, 768 (9th Cir.2012) (rejecting torture-related *Bivens* claim by U.S. citizen because, while torture was a recognized violation of an international norm in 2001–03, it was not universally established that the enhanced interrogation techniques used against Padilla constituted torture).

### A. Torture

Specifically, as to Plaintiffs torture claims, Defendant CACI PT argues that the definition of torture at the time of the alleged offense is unclear. CACI cites *Padilla v. Yoo* in support of this assertion. 678 F.3d 748 (9th Cir.2012). In *Padilla,* the Ninth Circuit dismissed a *Bivens* claim asserted against John Yoo, Deputy Assistant Attorney General at the Office of Legal Counsel, based on advice he provided from 2001 to 2003 concerning permissible standards for detainee treatment. *Id.* The Court reasoned that at the time of Padilla's detainment in early May 2002, there was widespread disagreement about whether the term "torture" applied to particular interrogation practices, such as "extreme isolation; interrogation under threat of torture, deportation and even death; prolonged sleep adjustment and sensory deprivation; exposure to extreme temperatures and noxious odors; denial of access to necessary medical and psychiatric care; substantial interference with [Padilla's] ability to practice his religion; and incommunicado detention for almost two years." *Id.* at 752. The court found that it was unable to "say that any reasonable official in 2001–03 would have known that the specific interrogation techniques allegedly employed against Padilla, however appalling, necessarily amounted to torture." *Id.* at 768. Accordingly, the court held that, while "the unconstitutionality of torturing an American citizen was beyond debate in 2001–03, it was not clearly established at that time that the treatment Padilla allege[d] he was subjected to amounted to torture. *Id.*

CACI lists five elements necessary for a torture claim under the ATS: "(1) that the defendant used extreme, deliberate and unusually cruel practices to inflict severe pain and suffering on the plaintiff; (2) that the acts were specifically intended to inflict severe pain and suffering on the plaintiff; (3) that the acts had an illicit purpose such as to obtain information from the plaintiff or a third person; (4) that a public official, prior to the activity constituting torture, had knowledge of such activity and thereafter breached his legal responsibility to intervene to prevent such activity; and (5) that the acts were not incidental to lawful sanctions." (Doc. 512 at 6.) Plaintiffs generally list the same elements, defining torture as "severe pain or suffering ... intentionally inflicted on [p]laintiffs for the purposes of punishing [p]laintiffs for acts that [p]laintiffs committed, and/or for the purposes of intimidating or coercing [p]laintiffs." *Doe v. Nestle, S.A.,* 748 F.Supp.2d 1057, 1077 (C.D.Cal.2010) (internal quotation marks omitted). Plaintiffs additionally recognize that torture "can only be committed by either state actors or those who act under the color of law." *Al–Quraishi v. Nakhla,* 728 F.Supp.2d 702, 748 (D.Md.2010); *see also In re Xe Servs. Alien Tort Litig.,* 665 F.Supp.2d 569, 588 (E.D.Va.2009) (citing *Sosa v. Alvarez–Machain,* 542 U.S. 692, 733 n. 20, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)) ("Nothing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals and corporations; indeed, *Sosa* simply refers to both individuals and entities as 'private actors.' ").

While the Parties generally agree on the elements of torture, predictably they disagree on whether those elements are met by Plaintiffs' claims. However, the Court need not determine whether the elements are met, or even what the elements are, because the lack of clarity as to the definition of torture during the relevant time period creates enough of cloud of ambiguity to conclude that the court lacks judicially manageable standards to adjudicate the merits of Plaintiffs' ATS torture claim.

**B. Cruel Inhuman and Degrading Treatment**

Cruel Inhuman and Degrading Treatment ("CIDT") has been defined as "acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which fall short of torture." *Nestle,* 748 F.Supp.2d at 1077 (internal quotations omitted). "The principal difference between torture and [cruel, inhuman, or degrading treatment] is 'the intensity of the suffering inflicted.' " *Id.* (quoting Restatement (Third) of Foreign Relations, § 702 n. 5). Both parties agree that in order to prove an ATS CIDT claim, the conduct alleged must be "universally condemned as cruel, inhuman, or degrading." *Al–Quraishi,* 728 F.Supp.2d at 759 (citing *Bowoto v. Chevron Corp.,* 557 F.Supp.2d 1080, 1094 (N.D.Cal.2008); *John Roe I v. Bridgestone Corp.,* 492 F.Supp.2d 988, 1023 (S.D.Ind. 2007) (applying the approach of "focusing on the particular conduct in question to decide whether the customary international norm against cruel, inhuman, and degrading treatment is sufficiently specific, universal and obligatory as applied to that conduct.")). CACI argues however, that courts disagree as to whether CIDT claims represent the type of universal obligatory norm recognized under the ATS. The Court here need not determine whether CIDT represents the type of universal, obligatory norms recognized under the ATS because the Court is persuaded that even if CIDT claims were recognized, Plaintiffs claims would still fail because CIDT did not apply to alien detainees held abroad.

The position of the United States, at the time of the conduct involved in this

action took place, was that the provision in the Convention Against Torture addressing CIDT did not apply to alien detainees held abroad.[4] Because Plaintiffs were alien detainees held abroad during a time when the Convention Against Torture did not apply to them, the Court finds that Plaintiffs are unable to state a claim for CIDT. Additionally, the definition of CIDT is so malleable that the Court would have a difficult time instructing a jury on the distinction between torture and CIDT. The Court's doubt as to the lucidness of a CIDT claim supports a finding that there would be a lack of judicially manageable standards in adjudicating the merits of this case.

## C. War Crimes

 Courts have acknowledged the United States' recognition of the definition of "war crimes" found in Common Article III of the Fourth Geneva Convention. *In re Xe Servs. Alien Tort Litig.*, 665 F.Supp.2d 569, 582 (E.D.Va.2009) (dismissing the plaintiffs' ATS claims because they failed to sufficiently allege facts of each element of a war crimes claim). Thus, it is a war crime to "intentionally . . . kill or inflict serious bodily injury upon innocent civilians during the course of an armed conflict." *Id.* To assert a war crimes claim, Plaintiffs must demonstrate that CACI PT "(i) intentionally (ii) killed or inflicted serious bodily harm (iii) upon innocent civilians (iv) during an armed conflict and (v) in the context of and in association with that armed conflict." *Id.* at 588.

CACI argues that resolution of Plaintiffs' war crimes claim would require the Court to determine, among other things, whether Plaintiffs were "civilians" (as opposed to insurgents), whether Plaintiffs

were "innocent" civilians, and whether the Plaintiffs suffered any injuries they can prove in the context of an armed conflict. Further, Defendant asserts that the requirement that the alleged conduct take place "in the context of and in association with [an] armed conflict" requires "a more substantial relationship . . . between the armed conflict and the alleged conduct than the mere fact that the conduct occurred while an armed conflict was ongoing." *Id.* at 585. Plaintiffs recognize this and assert that the nexus may be shown by demonstrating that the defendant "act[ed] with a purpose related to the objectives of the armed conflict," as well as other factors, such as "temporal and geographic proximity to the armed conflict, the nature of the conduct, and the identity of the victims." *Id.* at 587.

 While the elements of an ATS war crime claim may seem straightforward, deciding the issue of whether Plaintiffs were innocent civilians is anything but simple. A determination as to whether Plaintiffs were insurgents, innocent civilians, or even innocent insurgents would compel the Court to step into the shoes of the military and question its decisions. The Court cannot and does not wish to make this step. Accordingly, the Court finds that even Plaintiffs' seemingly straightforward ATS war crime claim would force the Court to question sensitive military judgments and further lacks judicially manageable standards.

Accordingly, Plaintiffs' claims are dismissed because the Court lacks judicially manageable standards to adjudicate the ATS claims presented by Plaintiffs.

## IV. CONCLUSION

The Court grants Defendants' Motion to Dismiss and holds that it does not have

4. Letter from William E. Moschella, Assistant Atty. General, to Senator Patrick J. Leahy (Apr. 4, 2005) at 2, *available at* http://www. scotusblog.com/movabletype/archives/CAT% 20Article% 2016. Leahy–Feinstein–Feingold% 20Letters.pdf.

subject-matter jurisdiction over this action because after analyzing the Complaint and other documents in the record, as instructed by the Fourth Circuit in *Al Shimari II*, *Al Shimari III*, and *Taylor*, the Court finds that Defendant was under the "plenary" and "direct" control of the military and that national defense interests are so "closely intertwined" with the military decisions governing Defendant's conduct, such that a decision on the merits would require this Court to question actual, sensitive judgments made by the military. Additionally, the Court finds that even were the Court to find jurisdiction on those grounds, Plaintiffs' claims could not be adjudicated because the case lacks judicially manageable standards. Accordingly, it is hereby

**ORDERED** that Defendant CACI Premier Technology Inc.'s Motion to Dismiss for Lack of Subject–Matter Jurisdiction (Doc. 516) is **GRANTED.**

**IT IS SO ORDERED.**