**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1810

FARHAN MOHAMOUD TANI WARFAA,

Plaintiff - Appellee,

v.

YUSUF ABDI ALI,

Defendant - Appellant.

No. 14-1934

FARHAN MOHAMOUD TANI WARFAA,

Plaintiff - Appellant,

v.

YUSUF ABDI ALI,

Defendant - Appellee.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:05-cv-00701-LMB-JFA)

Argued: September 16, 2015          Decided: February 1, 2016

Before GREGORY, AGEE, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the majority opinion, in which Judge Diaz joined. Judge Gregory wrote a separate opinion dissenting in part.

---

**ARGUED:** Joseph Peter Drennan, Alexandria, Virginia, for Appellant/Cross-Appellee. Tara Melissa Lee, DLA PIPER LLP (US), Reston, Virginia, for Appellee/Cross-Appellant. **ON BRIEF:** Joseph C. Davis, Reston, Virginia, Paul D. Schmitt, Mason Hubbard, DLA PIPER LLP (US), Washington, D.C.; Laura Kathleen Roberts, Nushin Sarkarati, Scott A. Gilmore, CENTER FOR JUSTICE & ACCOUNTABILITY, San Francisco, California, for Appellee/Cross-Appellant.

---

AGEE, Circuit Judge:

Farhan Warfaa alleges that in 1987, a group of soldiers kidnapped him from his home in northern Somalia. Over the next several months, Warfaa claims he was beaten, tortured, shot, and ultimately left for dead at the direction of Yusuf Ali, a colonel in the Somali National Army at the time. Warfaa later sued Ali under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), alleging several violations of international law.

After lifting a multi-year stay, the district court dismissed Warfaa's ATS claims, finding they did not sufficiently "touch and concern" the United States so as to establish jurisdiction in United States courts under Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1669 (2013). The district court allowed Warfaa's TVPA claims to proceed after holding that Ali was not entitled to immunity as a foreign official. Both Warfaa and Ali appeal. For the reasons set forth below, we affirm the judgment of the district court.

I.

Throughout the 1980s, Somalia experienced a period of political upheaval.[1] A military dictatorship led by Siad Barre controlled the country's government, and Barre's dictatorship employed violence and intimidation to maintain control and stay in power. Among other things, the Somali government targeted members of certain opposition "clans" through killings, torture, and property destruction. Warfaa's clan, the Isaaq, was targeted.

Ali supported the Barre regime and commanded the Fifth Battalion of the Somali National Army stationed in Gebiley, the area where Warfaa lived. Early one morning in December 1987, two armed soldiers from the Fifth Battalion appeared at Warfaa's hut, rousted him from his sleep, and forced him to a nearby collection point. There, Warfaa and several other local farmers learned that they were accused of supporting an opposition organization, the Somali National Movement ("SNM"). Soldiers then forced the men to march to another village where an army truck drove them to Fifth Battalion headquarters. Some of the other farmers were freed, but Warfaa, as a member of the Isaaq

---

[1] Because this appeal stems from the grant of a motion to dismiss, we accept as true all well-pled facts in Warfaa's complaint and construe them in the light most favorable to him. United States v. Triple Canopy, 775 F.3d 628, 632 n.1 (4th Cir. 2015).

4

clan, was detained and placed in a small, windowless cell with ten other prisoners.

Warfaa alleges he was subjected to many acts of violence during his detention at the direction of Ali. For instance, Warfaa claims that soldiers hit him with the butt of a gun, tied him in a painful position, kicked him, and stripped him naked. He was taken to Ali's office, where Ali personally questioned him about his supposed support of SNM and his rumored involvement in the theft of a water truck. Later, soldiers again stripped Warfaa naked, beat him to unconsciousness, woke him with cold water, and then beat him again. Once more, Ali interrogated Warfaa after this torture, this time with Warfaa's hands and feet chained. During the early months of 1988, Ali and his soldiers committed similar acts of torture against Warfaa at least nine times.

In March 1988, SNM fighters attacked Fifth Battalion headquarters while Ali was interrogating Warfaa. After ordering his soldiers to defend the base, Ali shot Warfaa in the wrist and leg, causing him to fall unconscious. Ali thought he had killed Warfaa and ordered his guards to bury the body. When Warfaa regained consciousness, however, he convinced the guards to accept a bribe, and they released him. Warfaa still resides in Somalia today.

The Barre regime collapsed in 1991, but Ali had departed the country in advance of the fall and immigrated to Canada in December 1990.  Canada deported Ali two years later for serious human rights abuses, and he then came to the United States.  The United States began deportation proceedings soon thereafter, but Ali voluntarily left the country in 1994.  For reasons not explained in the record, Ali returned to the United States in December 1996 and now resides in Alexandria, Virginia.[2]

Warfaa, identified only as a John Doe, and a Jane Doe originally filed suit against Ali in the United States District Court for the Eastern District of Virginia in 2004.  Plaintiffs voluntarily dismissed the complaint and refiled it in June 2005.

For most of its duration, this case has been stayed.  In August 2005, the district court stayed the case until a party could provide a declaration from the United States Department of State indicating that the action would not interfere with U.S. foreign policy.  In April 2012, after the case briefly resumed, the district court granted a consent motion to further stay the

---

[2] It is unclear from the record why Ali came to the United States after deportation by Canada and why he remains in the United States.  Ali was arrested in 1998 by agents of the Immigration and Naturalization Service, who indicated he was responsible for "genocidal acts" that "led to the deaths of thousands of people."  See David Stout, Ex-Somali Army Officer Arrested in Virginia, N.Y. Times, Feb. 28, 1998, at A4.  The record contains no evidence explaining the disposition of these claims.

case pending the Supreme Court's decision in Kiobel. After the Supreme Court issued its Kiobel decision in April 2013, the district court again extended the stay and invited the State Department to express its view as to whether the issues before the court would affect United States foreign policy. The State Department "decline[d] to express views on the subject" and, upon further request, explained that it was "not in a position to present views to the Court concerning this matter at this time."[3] J.A. 17, 22.

On April 25, 2014, the district court lifted the stay and ordered Warfaa to file an amended complaint. Warfaa's amended complaint contains six counts: (1) attempted extrajudicial killing; (2) torture; (3) cruel, inhuman, or degrading treatment or punishment; (4) arbitrary detention; (5) crimes against humanity; and (6) war crimes. All six counts allege torts purportedly committed in violation of international law, with jurisdiction arising under the ATS. In addition, the first two counts -- attempted extrajudicial killing and torture -- are alleged to violate the TVPA, which provides a jurisdictional

---

[3] Requesting the State Department's view is common in cases that implicate foreign policy. The Court "give[s] absolute deference to the State Department's position on status-based immunity doctrines such as head-of-state immunity. The State Department's determination regarding conduct-based immunity, by contrast, is not controlling, but it carries substantial weight in [the Court's] analysis of the issue." Yousuf v. Samantar, 699 F.3d 763, 773 (4th Cir. 2012).

7

basis separate from the ATS. See 28 U.S.C. § 1350 note; Kiobel, 133 S. Ct. at 1669 (Kennedy, J., concurring) (noting the TVPA addresses "human rights abuses committed abroad").

Ali filed a motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Although the motion did not address Kiobel, the district court subsequently ordered Warfaa to explain "at [a] scheduled hearing" why his ATS claims were not barred by the Supreme Court's ruling. See J.A. 56-57. At the hearing on the motion to dismiss, the district court stated that it was "going to dismiss the ATS claims from this case" "on the basis of Kiobel" because "[t]here is absolutely no connection between the United States and [Ali]'s conduct in Somalia." J.A. 66. It further indicated that it was not inclined to dismiss the TVPA claims.

In a subsequent written opinion, the district court granted Ali's motion to dismiss as to the ATS claims, but denied the motion as to the TVPA claims. The district court dismissed the ATS claims because "such claims, generally speaking, must be based on violations occurring on American soil." J.A. 78. In this case, however, "all the relevant conduct . . . occurred in Somalia, carried out by a defendant who at the time was not a

8

citizen or resident of the United States." Id.[4] The district court rejected Ali's motion to dismiss the TVPA counts, concluding that Ali could not claim "official acts" immunity because his alleged acts violated jus cogens norms.[5]

Both parties timely appealed. Ali appeals the district court's decision to "reject the Defendant's plea of common law immunity from suit." J.A. 101; see Yousuf v. Samantar, 699 F.3d 763, 768 n.1 (4th Cir. 2012) (explaining that a foreign official is entitled to lodge an immediate appeal from a pretrial order denying him "common law" immunity). Warfaa appeals from the final judgment on the ATS claims. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[4] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

[5] The district court also concluded that (1) the complaint alleged sufficient facts under Federal Rule of Civil Procedure 12(b)(6), (2) the TVPA's statute of limitations did not justify dismissal, (3) the case did not present a non-justiciable political question and (4) Ali could not seek protection under the act-of-state doctrine. Ali does not meaningfully challenge those portions of the district court's decision. As to those issues, his only argument consists of one sentence: "Perforce, Ali further urges that the fact that the subject matter of the instant litigation also presents a non-justiciable political question and an act of state confer further reasons for reversal of the subject Order appealed from." Ali's Opening Br. 10. Because Ali "does not develop the[se] argument[s] or offer any explanation for or analysis of his position in his initial brief," the Court need not consider them, and we do not. United States ex rel. Ubl v. IIF Data Solutions, 650 F.3d 445, 457 (4th Cir. 2011) (finding that a single sentence raising an argument did not preserve it).

## II.

Whether the ATS bars claims related to extraterritorial conduct presents an issue of subject matter jurisdiction, Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 520 (4th Cir. 2014), which the Court considers de novo. Johnson v. Am. Towers, LLC, 781 F.3d 693, 701 (4th Cir. 2015). Likewise, the district court's denial of foreign official immunity presents a question of law that the Court must decide de novo. See Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (reviewing a district court's decision to deny qualified immunity de novo); Wye Oak Tech., Inc. v. Repub. of Iraq, 666 F.3d 205, 212 (4th Cir. 2011) (considering a question of immunity under the Foreign Sovereign Immunities Act de novo).

## III.

The ATS "does not expressly provide any causes of action." Kiobel, 133 S. Ct. at 1663. Rather, it grants district courts "original jurisdiction" over "any civil action by an alien for a tort . . . committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

"Passed as part of the Judiciary Act of 1789, the ATS was invoked twice in the late 18th century, but then only once more

10

over the next 167 years." Kiobel, 133 S. Ct. at 1663. After 1980, ATS claims became more common, often relying on the Second Circuit's decision in Filártiga v. Peña-Irala, 630 F.2d 876 (2d Cir. 1980). In that case, the Second Circuit applied the ATS to a claim of torture committed abroad, with all of the acts involving foreign nationals. Id. at 878, 889. Filártiga opened the door to more ATS claims and "launched modern ATS litigation," Perry S. Bechky, Homage to Filártiga, 33 Rev. Litig. 333, 336 (2014), but recent Supreme Court decisions have significantly limited, if not rejected, the applicability of the Filártiga rationale. See Kiobel, 133 S. Ct. at 1664 (holding that ATS includes implicit geographic limits); Sosa v. Alvarez-Machain, 542 U.S. 692, 732 (2004) (holding federal courts cannot recognize claims brought via the ATS unless plaintiffs premise those claims on "specific, universal, and obligatory" international norms).[6]

---

[6] Warfaa's citation to Filártiga as contrary authority is without merit after the Supreme Court's decision in Kiobel. As commentators have noted, "[t]he Kiobel Court all but annulled the subject-matter jurisdiction granted by the Alien Tort Statute for the very cases for which Filártiga had made it matter, cases in which the alleged tort occurs within the territorial borders or waters of a foreign sovereign." Louise Weinberg, What We Don't Talk About When We Talk About Extraterritoriality: Kiobel and the Conflict of Laws, 99 Cornell L. Rev. 1471, 1496 (2014). This Court has cited Filártiga once, in Al Shimari, and we did so only as a passing reference without any discussion of the Second Circuit's analysis in the context of Kiobel. Whatever lingering value in a particular (Continued)

Alien plaintiffs, like Warfaa, have sought to invoke the ATS as a means to seek relief for alleged international human-rights violations. The Supreme Court has explained, however, the reach of the ATS is narrow and strictly circumscribed. Kiobel, 133 S. Ct. at 1664.

In Kiobel, the Supreme Court considered whether an ATS claim "may reach conduct occurring in the territory of a foreign sovereign." Id. The answer, for the most part, is "no," as the Supreme Court has applied a "presumption against extraterritorial application." Id. The presumption "provides that when a statute gives no clear indication of an extraterritorial application, it has none, and reflects the presumption that United States law governs domestically but does not rule the world." Id. A court that applies the ATS extraterritorially risks interference in United States foreign policy. Id. at 1664-65 ("[T]he principles underlying the [presumption] similarly constrain courts considering causes of action that may be brought under the ATS."). Accordingly, in Kiobel, the "petitioners' case seeking relief for violations of the law of nations occurring outside the United States [wa]s

---

circumstance Filártiga may have, if any, would not apply in a case like Warfaa's, where the only pled event to "touch and concern" the United States is the defendant's post-conduct residency in the United States.

12

barred." Id. at 1669. The Supreme Court emphasized that the ATS can create jurisdiction for such claims only where they "touch and concern" United States territory "with sufficient force to displace the presumption against extraterritorial application." Id.

This Court has applied Kiobel only once, in Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 529 (4th Cir. 2014). In that case, four plaintiffs sued an American military contractor and several of its employees who were alleged to be American citizens directly responsible for abusive mistreatment and torture at the Abu Ghraib prison in Iraq. Id. at 520-21. We recognized that "the clear implication of the [Supreme] Court's 'touch and concern' language is that courts should not assume that the presumption categorically bars cases that manifest a close connection to United States territory." Id. at 528. To find that the presumption against extraterritoriality applies, "it is not sufficient merely to say that . . . the actual injuries were inflicted abroad." Id. Instead, courts should conduct a "fact-based analysis." Id.

Applying this analytical framework, we found that the Al Shimari plaintiffs alleged "extensive 'relevant conduct' in United States territory," which distinguished their case from Kiobel. Id. Based on that "extensive relevant conduct," the plaintiffs' claims sufficiently "touch[ed] and concern[ed]" the

13

United States to establish jurisdiction under the ATS.[7]  Id. at 529.

Al Shimari thus is best read to note that the presumption against ATS extraterritorial application is not irrefutable.  A plaintiff may rebut the presumption in certain, narrow circumstances: when extensive United States contacts are present and the alleged conduct bears such a strong and direct connection to the United States that it falls within Kiobel's limited "touch and concern" language.  The usual case will not present the strong and direct "touches" we recognized in Al Shimari.

An ATS claim premised on no relevant conduct in the United States will fit within the heartland of cases to which the extraterritoriality presumption applies.  Doe v. Drummond Co.,

_____

[7] In Al Shimari, the Court cited five significant points of contact with the United States: the defendant-contractor's "status as a United States corporation"; the "United States citizenship of [the contractor]'s employees, upon whose conduct the ATS claims are based"; the fact that the contractor's "contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required [the contractor]'s employees to obtain security clearances from the United States Department of Defense"; "allegations that [the contractor]'s managers in the United States gave tacit approval to the acts of torture committed by [the contractor]'s employees . . . ., attempted to 'cover up' the misconduct, and 'implicitly, if not expressly, encouraged' it"; and congressional intent "to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad."  Id. at 530-31.  There are no such contacts, or anything close to them, in Warfaa's case.

14

782 F.3d 576, 592 n.23 (11th Cir. 2015) ("[I]f no relevant aspects of an ATS claim occur within the United States, the presumption against extraterritoriality prevents jurisdiction[.]"); Mujica v. AirScan Inc., 771 F.3d 580, 592 (9th Cir. 2014) ("The allegations that form the basis of Plaintiffs' claims exclusively concern conduct that occurred in Colombia."); Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 49 (2d Cir. 2014) ("[A]ll the relevant conduct set forth in plaintiff's complaint occurred in Bangladesh, and therefore plaintiff's claim brought under the ATS is barred."); Cardona v. Chiquita Brands Int'l, Inc., 760 F.3d 1185, 1191 (11th Cir. 2014) (holding that the presumption applied because the alleged torture "occurred outside the territorial jurisdiction of the United States"); Balintulo v. Daimler AG, 727 F.3d 174, 189 (2d Cir. 2013) ("Kiobel forecloses the plaintiffs' claims because the plaintiffs have failed to allege that any relevant conduct occurred in the United States.").

Warfaa's cross-appeal asks the Court to apply Kiobel and Al Shimari to permit a claim against a U.S. resident, Ali, arising out of conduct that occurred solely abroad. We analyze that claim by beginning with Kiobel's strong presumption against extraterritorial application of the ATS, recognizing Al Shimari is the rare case to rebut the presumption.

15

Warfaa's claims fall squarely within the ambit of Kiobel's broad presumption against extraterritorial application of the ATS.[8] As with Kiobel, in this case, "all of the relevant conduct took place outside the United States," in Somalia. Kiobel, 133 S. Ct. at 1669. Nothing in this case involved U.S. citizens, the U.S. government, U.S. entities, or events in the United States. The alleged campaign of torture and intimidation was launched, managed and controlled by the Somali army. Ali inflicted all the injuries against Warfaa in Somalia. Warfaa's ultimate escape -- thus ending the violation -- occurred in Somalia, as well.

The only purported "touch" in this case is the happenstance of Ali's after-acquired residence in the United States long

_____

[8] The dissent suggests that Kiobel applies only to corporate defendants, not natural persons like Ali. Nothing in Kiobel lends support to that argument. Instead, the Supreme Court painted with broad strokes when discussing the scope and purposes of the presumption against extraterritorial application of the ATS, purposes which apply with equal force when it comes to natural person defendants. Further, the dissent correctly recognizes that post-Kiobel no Circuit Court has permitted an ATS claim premised on individual liability to proceed in the absence of any cognizable "touches" within the United States. Dissenting Op. 21. Nonetheless, the dissent relies on Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304 (D. Mass. 2013), for the proposition that citizenship status distinguishes this case from Kiobel. Ali, however, is not a United States citizen, and the facts alleged in Lively have no correlation to the allegations pled in this case. For example, in Lively, "the Amended Complaint allege[d] that the tortious acts committed by Defendant took place to a substantial degree within the United States, over many years, with only infrequent actual visits to Uganda." Id. at 321.

16

after the alleged events of abuse.[9]  Mere happenstance of residency, lacking any connection to the relevant conduct, is not a cognizable consideration in the ATS context.  See Kiobel, 133 S. Ct. at 1669 (indicating the defendant's "mere . . . presence" in the United States does not afford jurisdiction).  "Kiobel's resort to the presumption against extraterritoriality extinguishes . . . ATS cases [with foreign parties and conduct], at least where all of the relevant conduct occurs outside the United States, even when the perpetrator later moves to the United States."  Bechky, supra, at 343.[10]

In sum, Warfaa has pled no claim which "touches and concerns" the United States to support ATS jurisdiction.  The district court thus did not err in granting Ali's motion to dismiss the ATS counts in the complaint for lack of jurisdiction.[11]

---

[9] The dissent's representation that Ali has sought "safe haven" here, Dissenting Op. 21, 28, is the dissent's characterization alone, and is not reflected in Warfaa's pleadings or the record in this case.

[10] The dissent implies some sort of military aid by the United States to Ali.  Dissenting Op. 26-27.  Such a claim was never pled, briefed or argued by Warfaa, and derives only from a factual reference in Ali's brief.  Ali's Opening Br. 8.  The record is devoid of any connection between Ali's alleged conduct in Somalia and some U.S. Military contact.  The dissent's comments in this regard are pure speculation.

[11] To the extent the district court's opinion reads Kiobel as creating a categorical rule barring the ATS' application to conduct solely outside the United States, that reading is overbroad.  Al Shimari makes clear that extensive and direct
(Continued)

17

IV.

The district court allowed Warfaa's TVPA claims to go forward, finding Ali lacked foreign official immunity for jus cogens violations under Yousuf v. Samantar, 699 F.3d 763, 777 (4th Cir. 2012). In Samantar, we held that foreign official immunity could not be claimed "for jus cogens violations, even if the acts were performed in the defendant's official capacity." Id. Ali does not contest that the misdeeds alleged in the complaint violate jus cogens norms; he concedes that they do. Rather, his challenge is a simple one: Samantar was wrongly decided, and jus cogens violations deserve immunity.

Ali would have us overrule Samantar entirely, but that course is not open to us. One panel's "decision is binding, not only upon the district court, but also upon another panel of this court -- unless and until it is reconsidered en banc." Doe v. Charleston Area Med. Ctr., Inc., 529 F.2d 638, 642 (4th Cir. 1975); see also, e.g., United States v. Spinks, 770 F.3d 285, 289-90 (4th Cir. 2014). True, the Court has the "statutory and constitutional power" to reconsider its own decisions. McMellon v. United States, 387 F.3d 329, 334 (4th Cir. 2004) (en banc).

"touches" involving the United States may rebut the presumption in some cases. Warfaa simply has none.

18

But we have decided collectively not to exercise that power as a "matter of prudence" outside the en banc context. Id. The district court properly concluded Samantar forecloses Ali's claim to foreign official immunity.

V.

For the reasons described above, the district court correctly held that Warfaa's ATS claims lacked a sufficient nexus with the United States to establish jurisdiction over those claims. The district court also correctly rejected Ali's claim of foreign official immunity. The district court's judgment is therefore

AFFIRMED.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I write separately to dissent from Part III of the majority opinion, as I would hold that the Supreme Court's decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013), does not foreclose the possibility of relief under the Alien Tort Statute ("ATS") here.

I.

In Kiobel, a group of Nigerian political asylees brought suit against Royal Dutch Petroleum Company, Shell Transport and Trading Company, and their joint subsidiary, Shell Petroleum Development Company of Nigeria, alleging that these companies aided and abetted the Nigerian government in committing human rights abuses against them. 133 S. Ct. at 1662-63. The defendants' only contacts with the United States were "listings on the New York Stock Exchange and an affiliation with a public relations office in New York." Mujica v. AirScan Inc., 771 F.3d 580, 591 (9th Cir. 2014) (citing Kiobel, 133 S. Ct. at 1662-63; id. at 1677-78 (Breyer, J., concurring)). The Court explained that "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices" to displace the presumption against extraterritoriality. Kiobel, 133 S. Ct. at 1669. The Court,

20

however, was "careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute." Id. (Kennedy, J., concurring).

Following Kiobel, a number of our sister circuits have considered and rejected ATS claims brought against U.S. corporations and their corporate officers for aiding and abetting foreign actors who commit human rights abuses. See Maj. Op. 14-15 (citing Doe v. Drummond Co., 782 F.3d 576, 601 (11th Cir. 2015); Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42, 45 (2d Cir. 2014); Cardona v. Chiquita Brands Int'l Inc., 760 F.3d 1185, 1188-89 (11th Cir. 2014); Mujica, 771 F.3d at 596; Balintulo v. Daimler AG, 727 F.3d 174, 179 (2d Cir. 2013)). But no circuit court has decided a post-Kiobel ATS case premised on principal liability brought against an individual defendant who has sought safe haven in the United States, a key difference the majority does not address. This is not to suggest that Kiobel applies only to corporate defendants, see Maj. Op. 16 n. 8, but that the analysis and relevant considerations may differ where the defendant is a natural person.

Several cases brought prior to Kiobel considered situations involving individual, natural-person defendants—facts more akin to those presented here. In Filartiga v. Pena-Irala, 630 F.2d 876, 878 (2d Cir. 1980), two Paraguayan citizens brought an

21

action against Pena-Irala ("Pena"), a Paraguayan police officer, for the torture and death of a relative. Pena had come to the United States, overstayed his visitor's visa, and had been residing in the United States for over nine months when one of the plaintiffs served him with a summons and civil complaint. Id. at 878-79. While acknowledging that "the Alien Tort Statute ha[d] rarely been the basis for jurisdiction during its long history," the Second Circuit found "little doubt" that the action was properly in federal court. Id. at 887. "This is undeniably an action by an alien, for a tort only, committed in violation of the law of nations." Id. Thus, jurisdiction under the ATS was proper. Id. at 889; see also Kadic v. Karadzic, 70 F.3d 232, 236-37 (2d Cir. 1995) (finding jurisdiction for ATS claims brought by Croat and Muslim citizens of Bosnia-Herzegovina against Bosnian-Serb leader for violations of the law of nations committed during the Bosnian civil war); In re Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493, 503 (9th Cir. 1992) (finding jurisdiction for ATS claim brought by Philippine citizen against former Philippine official for violations of the law of nations committed abroad).

The majority states that "recent Supreme Court decisions have significantly limited, if not rejected, the applicability of the Filartiga rationale." Maj. Op. 11 (citing Kiobel, 133 S. Ct. at 1664; Sosa v. Alvarez-Machain, 542 U.S. 692, 732 (2004)).

22

Nothing in those opinions, however, explicitly overrules Filartiga or its progeny. In fact, the Supreme Court in Sosa "referred to [Filartiga and Marcos] with approval, suggesting that the ATS allowed a claim for relief in such circumstances." Kiobel, 133 S. Ct. at 1675 (Breyer, J., concurring) (citing Sosa, 542 U.S. at 732). Even Congress has recognized that Filartiga was "met with general approval." H.R. Rep. No. 102-367, pt. 1, at 4 (1991); S. Rep. No. 102-249, at 4 (1991). Therefore, Filartiga is still good law, and its reasoning is instructive here.

## II.

This case involves "allegations of serious violations of international law" committed by a natural person who has sought safe haven within our borders and includes claims that are not covered by the Torture Victim Protection Act nor "the reasoning and holding" of Kiobel. Id. at 1669 (Kennedy, J., concurring). Thus, the "proper implementation of the presumption against extraterritorial application" in this case requires "further elaboration and explanation." Id. Blithely relying on the fact that the human rights abuses occurred abroad ignores the myriad ways in which this claim touches and concerns the territory of the United States.

23

As the majority correctly states, "claims" are cognizable under the ATS where they "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Maj. Op. 13 (citing Kiobel, 133 S. Ct. at 1669). The Supreme Court's use of "claim"—rather than conduct—to describe the circumstances in which the presumption may be displaced, however, "suggest[s] that courts must consider all the facts that give rise to ATS claims, including the parties' identities and their relationship to the causes of action." Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 527 (4th Cir. 2014).

If we consider, as we must, a "broader range of facts than the location where the plaintiff[] actually sustained [his] injuries," there are three facts that distinguish this case from Kiobel. Id. at 529. First, Ali's status as a lawful permanent resident alone distinguishes this case from Kiobel, where the corporate defendant was merely "present." Kiobel, 133 S. Ct. at 1669. This Court found a defendant's citizenship status to be a relevant "touch" in Al Shimari, where we observed that such "case[s] do[] not present any potential problems associated with bringing foreign nationals into United States courts to answer for conduct committed abroad, given that the defendants are United States citizens." Al Shimari, 758 F.3d at 530 (citing Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 322 (D.

24

Mass. 2013) (holding that Kiobel did not bar ATS claims against an American citizen, in part because "[t]his is not a case where a foreign national is being hailed into an unfamiliar court to defend himself")). To the extent that we rely on citizenship status as a factor, we do so in the good company of our dear colleagues sitting on this very Court. See Maj. Op. 16, n. 8. As a legal permanent resident, Ali "has a binding tie to the United States and its court system." Yousuf v. Samantar, 699 F.3d 763, 778 (4th Cir. 2012); see also id. at 767 (finding relevant the fact that U.S. residents "who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts").

Second, Ali's "after-acquired residence" in this country is not mere "happenstance." Maj. Op. 16. Ali was in the United States when he "realiz[ed] that the Barre regime was about to fall." Decl. of Ali ¶ 15, Br. in Supp. of Def.'s Renewed Mot. to Dismiss at 1, Warfaa v. Ali, 33 F. Supp. 3d 653 (2014) (No. 1:05-cv-701), ECF No. 91. He initially sought refugee status in Canada. Id. at ¶ 15. Canada deported Ali back to the United States for gross human rights abuses committed in Somalia. Id. at ¶ 18; J.A. 74. When confronted with deportation proceedings upon entering the United States, he voluntarily departed, only to return two years later on a spousal visa. Decl. of Ali ¶ 22. In 1997, Ali was confronted with deportation proceedings yet

25

again but prevailed at trial to have proceedings terminated. Id. at ¶ 23.  The government did not appeal.  Id.  He has been living here as a lawful permanent resident, availing himself of the benefits and privileges of U.S. residency since 1996.

Lastly, when the alleged acts of torture took place, Ali was serving as a commander in the Somali National Army.  In that same capacity, he received extensive military training, on numerous occasions, in the United States.  The details of these contacts, which took place prior to and following the alleged acts, are laid out by Ali himself in a declaration to the district court.[1]  In 1984, Ali received special military training with the Officers' Advanced Military Course at Fort Benning, Georgia.  Decl. of Ali ¶ 8, Br. in Supp. of Def.'s Renewed Mot. to Dismiss at 1, Warfaa v. Ali, 33 F. Supp. 3d 653 (2014) (No. 1:05-cv-701), ECF No. 91.  Later that year, he returned to Fort Benning where he completed six months of intensive military training.  Id. at ¶ 10.  In 1985, he was invited by a representative of the Defense Intelligence Agency to pursue further military training at Fort Leavenworth, where he spent a

---

[1] Ali's military training in the United States is a relevant "touch" and the fact that it was brought to the Court's attention solely by Ali himself does not insulate it from our consideration.  Cf. United States v. Wilson, 699 F.3d 789, 793 (4th Cir. 2012) ("[W]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented." (quoting Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012)).

26

year, before returning to Somalia in July of 1986. Id. Finally, he received training in management studies with the U.S. Air Force at Keesler Air Force Base a mere two years after the acts alleged against him in this case. Id. at ¶ 10. This is not to suggest that the U.S. government condoned or endorsed defendant's conduct, but these contacts are clearly relevant to a test that requires us to consider whether a claim "touch[es] and concern[s] the territory of the United States."[2] Kiobel, 133 S. Ct. at 1669. When pressed at oral argument, even counsel for Ali did not deny that a "prior relationship," such as the military training at issue here, would "perhaps" be something to consider as part of the touch and concern inquiry. Oral Argument at 34:44.

Whatever the extent of the relationship between Ali and the U.S. military, it cannot be fairly said that "[t]he only purported 'touch' in this case is the happenstance of Ali's after-acquired residence in the United States long after the alleged events of abuse." Maj. Op. 16-17.

---

[2] See George James, Somalia's Overthrown Dictator, Mohammed Siad Barre, Is Dead, N.Y. Times, Jan. 3, 1995, at C41 ("Somalia received military and economic aid from the United States for a promise of American use of the port of Berbera on the Gulf of Aden. But aid declined drastically as allegations of human rights abuses rose.").

27

III.

The majority today allows a U.S. resident to avoid the process of civil justice for allegedly "commit[ting] acts abroad that would clearly be crimes if committed at home." United States v. Bollinger, 798 F.3d 201, 219 (4th Cir. 2015) (upholding the constitutionality of 18 U.S.C. § 2423(c) under the Foreign Commerce Clause). The precedential effect of this holding "could undoubtedly have broad ramifications on our standing in the world, potentially disrupting diplomatic and even commercial relationships." Id.

It is not the extraterritorial application of the ATS in the instant case that "risks interference in United States foreign policy," but rather, providing safe haven to an individual who allegedly committed numerous atrocities abroad. Maj. Op. 12. This was the case in Filartiga, where, as here, "[t]he individual torturer was found residing in the United States." Suppl. Br. for United States as Amicus Curiae in Partial Supp. of Affirmance at 4, Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013) (No. 10-1491). These are "circumstances that could give rise to the prospect that this country would be perceived as harboring the perpetrator," thereby "seriously damag[ing] the credibility of our nation's commitment to the protection of human rights." Id. at 19 (citing Mem. for the United States as Amicus Curiae at 22-23,

28

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d. 1979) (No. 79-6090)). Such concerns are precisely what led the United States, writing as amicus in *Kiobel*, to conclude that "allowing suits based on conduct occurring in a foreign country in the circumstances presented in *Filartiga* is consistent with the foreign relations interests of the United States, including the promotion of respect for human rights." Suppl. Br. for the United States in Partial Supp. of Affirmance at 4-5, *Kiobel*, 133 S. Ct. 1659 (2013) (No. 10-1491).

The ATS has not been completely abrogated by *Kiobel*. It is still a statute, and Congress meant something by it. The fact that the alleged torts occurred outside our borders cannot be the end of the story; what we are dealing with, after all, is the *Alien* Tort Statute.

Ali is alleged to have committed gross human rights abuses, for which he was deported from Canada, and is now a lawful permanent resident. The United States is the sole forum in which he is amenable to suit. The atrocious nature of these allegations, the extensive contacts with the United States, and the context of those contacts renders jurisdiction proper under the ATS. I would reverse the district court's summary dismissal of the ATS claims and find that Warfaa has pleaded sufficient facts showing that his claim touches and concerns the territory

of the United States. I respectfully dissent from the majority's holding on this issue.